1 Cal.Rptr.3d 578 (2003)
110 Cal.App.4th 214
In re C.D. et al., Persons Coming Under the Juvenile Court Law.
Department of Children and Family Services, Los Angeles County, Plaintiff and Respondent,
v.
Eric D., Defendant and Appellant.
No. B157482.
Court of Appeal, Second District, Division Seven.
July 7, 2003.
*580 John L. Dodd, Tustin, under appointment by the Court of Appeal, for Defendant and Appellant.
Lloyd W. Pellman, County Counsel, and Stephanie Jo Farrell, Deputy County Counsel, for Plaintiff and Respondent.
Certified for Partial Publication.[*]
*579 JOHNSON, J.
Eric D. (father) appeals from the juvenile court's dispositional order removing his two children from his custody. Father asks this court to reverse the order based on his contentions: (1) the Los Angeles County Department of Children and Family Services failed to comply with the notice requirements of the Indian Child Welfare Act,[1] (2) the court abused its discretion when it denied father's Marsden[2] motion, (3) there is insufficient evidence supporting the court's decision to remove the children, and (4) there is insufficient evidence supporting the court's finding father has a history of drug and alcohol use.
In the published portion of the opinion, we hold notice to a tribe under the Indian Child Welfare Act (ICWA) must include, among other things, the categories of information set forth in the Bureau of Indian Affairs Guidelines (Guidelines) at 25 Code of Federal Regulations part 23.11 (d)(3), if such information is known, including, but not limited to, the name of a child's grandparents. We find the Department of Children and Family Services has complied with the notice requirements of the ICWA in this case.
In the unpublished portion of the opinion, we find there is insufficient evidence to support the juvenile court's jurisdictional finding regarding drug and alcohol use. Accordingly, we reverse this finding and the dispositional order to the extent the order includes a substance abuse component. We affirm the dispositional order in all other respects, and reject father's Marsden challenge.

FACTS AND PROCEEDINGS BELOW
On September 14, 2001, the Los Angeles Sheriffs Department took father's children into protective custody based on allegations of physical abuse by father. The same day, deputies and a social worker interviewed the children, M. (age 7), and C. (age 8).
According to the detention report, M. said father "slapped him in the cheek and eye causing him to suffer a black eye and fall to the ground" on September 10, after father discovered M. had been hiding notes from his teacher. M. said father kept him out of school for three days because he did not want anyone to see the black eye. M. *581 also said father kicked him on the legs and hit him on his buttocks with a belt the same day. At the time of the interview, M. had bruising and swelling around his left eye, "a one-inch abrasion on his back" and "two horizontal marks across his buttocks." M. recounted another incident of abuse which occurred when he was helping his father with a chore. M. said "father smacked him in the mouth causing his tooth to bleed," and hit him on the forehead with father's head, because M. did not understand and follow father's directions. M. said father told him not to talk to social workers or "the cops."
C. said father also told her not to talk to social workers and not to open the door if a social worker comes to the house with the police. During the interview, C. denied M. had a black eye and she "tried to convince [M.] that father did not hit him." C. said "sometimes father hits her on the head and causes her to lose her balance and fall to [the] ground." She recounted an incident which she said occurred around January 2001 when "father `smacked' her in the head and started kicking her" when she burned some noodles she was cooking. C. said she was stirring the noodles when father hit her on the head and this caused her to burn her arm and hand. C. showed the social worker a scar on her arm which she said resulted from this incident. C. said when she was five years old father also hit her and kicked her when "she was stirring the food and she was not doing it right."
Father denied M. had a black eye, but said "he did see a scratch near [M.'s] eye that might have come from their dog." Father said he disciplined M. for hiding the notes by standing him in the corner. He said he kept M. out of school for a few days and brought M. to work with him "to give [M.] a `one on one, bonding time'" with father and to encourage M. "to get an education so he does not have to work two jobs like father does." Father explained the children had no contact with their mother. He said they were taken away from her about five years before because they were malnourished and were living in a dirty home.[3] Father said that as a result of a prior dependency case, he attended two parenting classes.
In a subsequent interview on September 17, 2001, C. said she wanted to tell the judge: "Dad's spanking us a lot. He's always putting us in the corner...." She also told the interviewer: "[Dad]'s being mean to us sometimes." M. said he wanted to tell the judge about the incident discussed above when he was doing a chore incorrectly and father "bumped his head into" M.'s head and "smacked" M. in the mouth, causing his tooth to bleed.
On September 19, 2001, the Department of Children and Family Services (DCFS) filed a petition under Welfare and Institutions Code [4] section 300, subdivisions (a) and (b), alleging father physically abused and neglected C. and M. The petition also alleged father has a history of using drugs and alcohol, which renders him "incapable of providing regular care for the children" and endangers the children's "physical and emotional health and safety and creates a detrimental home environment." A social worker from San Luis Obispo, who had dealt with this family in the past, reported "there were allegations of drug and alcohol abuse for mother and father" in a prior dependency case.
*582 On September 19, father appeared at a detention hearing and the juvenile court appointed counsel for him. The court found DCFS had made a prima facie case for detaining C. and M. and ordered them placed in foster care. The court also ordered reunification services and monitored visits for father. At the hearing, father reported the children's paternal grandfather, who is deceased, was of Blackfeet heritage. The court appointed an expert to determine whether the "case falls within the Indian Child Welfare Act [ICWA]." Mother later reported her paternal grandparents, who are deceased, "had Cherokee American Indian heritage."
DCFS sent notice of the proceedings under the ICWA to the Bureau of Indian Affairs (BIA), the Blackfeet Tribe, the Eastern Band of Cherokee Indians, the Cherokee of South East Alabama and the Cherokee Nation of Oklahoma. DCFS used a preprinted form issued by the State of California Health and Welfare Agency and the California Department of Social Services entitled "Notice of Involuntary Child Custody Proceeding Involving an Indian Child" (form SOC 19).
DCFS also asked the BIA to confirm the children's status with the Blackfeet and Cherokee Tribes. For this purpose, DCFS used another pre-printed form issued by the State of California Health and Welfare Agency and the California Department of Social Services entitled "Request for Confirmation of Child's Status as Indian" (form SOC 318). This form includes a space for identifying a child's grandparents. DCFS did not provide this information to the BIA even though father had given DCFS the name of the children's paternal grandfather and had represented the grandfather was of Blackfeet heritage.
In November 2001, DCFS prepared a Jurisdictional/Dispositional Hearing Report which updated the juvenile court on father's criminal case resulting from the September 10 incident of alleged physical abuse. On October 19, the criminal court ordered father to stay at least 100 yards away from C, M., and their babysitter. Before this order, father had visited and called the children regularly.
The same Hearing Report discusses a social worker's interview with C. and M. on October 29, 2001. When asked about the incidents of physical abuse, C. responded: "[M.] was put in the corner ... kicked in the leg, 1 black eye, smacks us in the head, smacks us on the bottom with a hand, with a belt, or he used corner and some nights he leaves us there all night, standing there facing the wall and I fall asleep on the rug. We never get any sleep. [Sic.]" C. said sometimes her father tells her and M. to pull their pants and underwear down before he spanks them. C. said she has gotten "a few bruises on [her] butt but [father] doesn't care." C. told the social worker: "I still want to live with my Dad if he don't spank us, hit us, yell at us, and he doesn't smack us or put us in the corner. That's what I want him to tell the Judge. If he doesn't keep his promise, I want to go back to foster care. I'll tell the nurse to tell the social worker to get us in foster care again."
M. told the social worker father slapped him in the face about a thousand times. He also said father sometimes smacks C. on the head, "flick[s]" both of them on the neck, hurts their feelings, and keeps them in the corner all night. M. said he wanted to live in the foster home and visit father.
The Hearing Report also contains information about father's alleged drug and alcohol use. C. told a social worker she had not seen her father use alcohol or drugs. Later C. said her father "had green bottles and drunk some ([C.] showed the height of a beer bottle)." Finally, *583 C. said her father did not drink from the green bottles, but "he gave some to his friends." M. said father "used to drink wine with friends," but he doesn't drink wine anymore. The children's mother told a social worker father "smokes Marijuana and drinks." Mother also reported "she saw alcohol bottles." Mother admitted she used to have a drug problem, and she said father had a drug problem in the past as well.
DCFS submitted documents to the juvenile court from the family's prior dependency case in San Luis Obispo. Social workers reported there "d[id] not appear to be any threat to the children's well-being in [father]'s home." In late 1997, the court awarded sole legal and physical custody of the children to father and terminated jurisdiction.
On November 21, 2001, father pleaded no contest to one misdemeanor count of inflicting injury upon a child[5] based on the September 10 incident of abuse on M. The court convicted father and placed him on summary probation for three years. The court also ordered father to complete 30 days of community service, pay a restitution fine, attend a 52-week parenting program and refrain from using excessive force on C. and M.
On March 25, 2002, the day of the disposition hearing, father asked the juvenile court to relieve his counsel. The court had appointed this attorney for father on November 7, 2001, after father's first attorney determined there was a conflict of interest. The juvenile court conducted a Marsden hearing and denied father's request for new counsel.
At the disposition hearing, DCFS submitted on the papers. Father presented the juvenile court with a notebook of evidence he had compiled, and the court received it into evidence. The notebook contained father's responses to statements in the reports and the allegations against him, letters from witnesses who saw M. around September 10 and said he did not have a black eye, awards and certificates he and the children had received, and pictures of the children. Father did not call any witnesses.
The court decided father's notebook of evidence "raise[d] a substantial question" as to whether M. had a black eye on September 10 and 11, 2001. Accordingly, the court struck an allegation in the petition concerning the black eye. Considering all of the documents in the record and father's misdemeanor conviction for inflicting injury on a child, the court found substantial evidence demonstrating father inappropriately disciplined C. and M. Therefore, the court sustained the following allegation: "[O]n prior occasions, minors' father excessively and inappropriately disciplined the children [C] and [M.][¶] That on or about 11/21/2001, father pled no contest to a violation of Penal Code section 273[d, subdivision (a)] regarding inappropriate discipline, and the criminal court accepted the plea entering a conviction on the misdemeanor charge. [¶] Such conduct by father endangers the minors' physical and emotional health and safety and places the minors at risk of serious physical harm."
The only other allegation in the petition the court sustained was the following allegation concerning drug and alcohol use: "[F]ather Eric [D.] has a history of using drugs and alcohol which renders the father Eric [D.] incapable of providing regular care for the children [C] and [M.] Further, the father Eric [D.J's substance abuse endangers the children [C] and [M.]'s physical *584 and emotional health and safety and creates a detrimental home environment."
The juvenile court declared C. and M. dependents of the court under section 300, subdivisions (a) and (b). The court found clear and convincing evidence demonstrating a substantial danger exists to the children's physical and emotional health and safety. The court also found "[t]here are no reasonable means to protect the children without removal from the custody of the father" and "[reasonable efforts have been made to prevent or eliminate the need for further removal." Having received no notice C. and M. are eligible for membership in any tribe, the court concluded the ICWA does not apply. The children remained placed with DCFS.
The court ordered reunification services and instructed father to attend parenting classes and individual counseling for anger management. The court also ordered father to complete "six clean, consecutive, random drug tests" before DCFS would be authorized to liberalize visitation for father.

DISCUSSION

I. DCFS HAS COMPLIED WITH THE NOTICE REQUIREMENTS OF THE ICWA.

Father contends DCFS failed to comply with the notice requirements of the ICWA because DCFS (1) did not include the children's paternal grandfather's name on the notices it sent to the Blackfeet Tribe and (2) did not send notice of the proceedings to one of the federally recognized Cherokee Tribes. Based on these grounds, father asks this court to reverse the order removing his children from his custody.
The ICWA is designed "to protect the interests of the Indian child" and "to promote the stability and security of Indian tribes and families."[6] It sets forth the manner in which a tribe may obtain jurisdiction over child custody proceedings involving an "Indian child" or intervene in the state court proceedings.[7] The notice requirements of the ICWA ensure a tribe will have "the opportunity to assert its rights" under the statute.[8]
Section 1912, (a) of the ICWA sets forth the following requirements for proper notice: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary...." California courts have concluded a "juvenile court's failure to secure compliance with" *585 these notice requirements constitutes prejudicial error.[9]

A. Notice to a Tribe Under the ICWA Must Include the Name of a Child's Grandparents and Any Other Information Set Forth in the BIA Guidelines at 25 Code of Federal Regulations Part 23.11(d)(3), to the Extent Such Information Is Known.

Father contends DCFS failed to give proper notice under the ICWA because it did not include the children's paternal grandfather's name on the notices it sent to the Blackfeet Tribe. Father argues the "omission of [the grandfather] name from the notices to the Blackfoot [sic][T]ribe very well may invalidate any determination by the Blackfoot [sic] Tribe that [C] and [M.] are not Indian children."
In California, an agency providing notice of dependency proceedings to a tribe under the ICWA is required to use form SOC 319 issued by the State of California Health and Welfare Agency and the Department of Social Services entitled "Notice of Involuntary Child Custody Proceeding Involving an Indian Child." Preprinted on this form is the following language: "Required FormNo Substitution Permitted." This form provides a tribe with information about a child's parents (names, tribal affiliation, birthplaces and birthdates), and notice of the dependency proceedings and of the tribe's right to intervene. California courts have concluded an agency complies with the notice requirements of the ICWA when it (1) fills out form SOC 319 and sends it to the appropriate tribe(s), by registered mail with return receipt requested, and (2) files with the juvenile court the completed form and proof of its service on the tribe.[10]
The State of California Health and Welfare Agency and the Department of Social Services also issued form SOC 318 entitled "Request for Confirmation of Child's Status as Indian." This form, which an agency also may send to a tribe, includes spaces for inserting information about a child's "family history," including the names and tribal affiliation of the child's grandparents. It is clear form SOC 318 does not satisfy the notice requirements of the ICWA because it does not provide a tribe with notice of the proceedings or of the tribe's right to intervene.[11]
Prior to the disposition hearing in this case, DCFS filled out and sent form SOC 319 to the Blackfeet Tribe and to the BIA. DCFS also sent form SOC 318 to the BIA. DCFS failed to insert the name of the children's paternal grandfather or his tribal affiliation on form SOC 318 (Request for Confirmation of Child's Status as Indian), even though father had provided this information. DCFS did not send form SOC 318 to the Blackfeet Tribe. Despite these omissions, DCFS arguably complied with the ICWA because it completely and correctly filled out the "required" formform SOC 319which gave the Blackfeet Tribe notice of the proceedings and of its right to intervene. This was our initial determination.
On February 18, 2003, we granted father's petition for rehearing in this matter *586 to review whether form SOC 319 is sufficient for providing notice to a tribe under the ICWA. Father contends proper notice to a tribe must include the name of a child's grandparents, if known. Form SOC 319 does not include a space for inserting the name of a child's grandparents.
In December 2002, while this appeal was pending, DCFS provided the Blackfeet Tribe with the name of the children's paternal grandfather and great grandfather, using form SOC 318 (Request for Confirmation of Child's Status as Indian). DCFS also provided notice of a January 7, 2003 hearing, using "required" form SOC 319. The juvenile court received no notice indicating the children are eligible for membership in the Blackfeet Tribe. At the January 7 hearing, the juvenile court concluded "this case does not fall within the [ICWA]."
DCFS has cured any notice problem father complains about. Notwithstanding that, we will not dismiss this issue as moot because it is of great public significance. Without proper notice to a tribe of dependency proceedings, the purposes of the ICWA cannot be fulfilled. Thus, we will review whether form SOC 319 is sufficient for providing notice under the ICWA.
The BIA Guidelines set forth specific categories of information an agency should include in its notice to a tribe under the ICWA.[12] "Although the Guidelines do not have a binding effect on this court, the construction of a statute by the executive department charged with its administration is entitled to great weight."[13] Like other California courts, we are "persuaded that insofar as the ICWA notice provisions are concerned, the Guidelines 'represent a correct interpretation of the [ICWA].'"[14] Accordingly, we will look to the Guidelines in determining whether form SOC 319 satisfies the notice requirements of the ICWA.
Aside from information about the hearing and the tribe's right to intervene in the dependency proceedings, the BIA Guidelines state notice to a tribe "shall include the following information, if known: [¶] (1) Name of the Indian child, the child's birthdate and birthplace. (2) Name of Indian tribe(s) in which the child is enrolled or may be eligible for enrollment. (3) All names known, and current and former addresses of the Indian child's biological mother, biological father, maternal and paternal grandparents and great grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers, and/or other identifying information. (4) A copy of the petition, complaint or other document by which the proceeding was initiated."[15]
Using "required" form SOC 319, an agency may provide a tribe with the information identified in subparagraphs (1), (2) and (4), set forth above. This form also includes spaces for inserting the names (including maiden and "all names known by"), tribal affiliation, birthplaces and birthdates of the child's mother and father. It does not include spaces for inserting any *587 of the other information identified in subparagraph (3), set forth above.
Using form SOC 318 (Request for Confirmation of Child's Status as Indian), an agency also may provide a tribe with the names (including maiden and all names known by), tribal affiliation and enrollment information, birthplaces and birthdates of the child's grandparents and great grandparents.
We hold notice to a tribe under the ICWA must include not only the information provided in connection with form SOC 319, but also the information set forth in the BIA Guidelines at 25 Code of Federal Regulations part 23.11(d)(3), if such information is known, including the name of a child's grandparents. Therefore, form SOC 319 fails to provide sufficient notice of dependency proceedings to a tribe under the ICWA when an agency knows additional information about a child's family history, such as the names of the grandparents. The agency (DCFS in this case) has a duty to inquire about and obtain, if possible, all of the information about a child's family history included on form SOC 319 and in 25 Code of Federal Regulations part 23.11(d)(3).[16]
Neither form SOC 319 nor form SOC 318 includes spaces for inserting the current or former addresses of any of a child's relatives (other than a reservation name). Nor does either form include spaces for inserting the place of death of any family member. Thus, even using both forms to provide notice to a tribe will not be sufficient in every case for providing all of the information identified in 25 Code of Federal Regulations part 23.11(d)(3). Therefore, we conclude the State of California Health and Welfare Agency and the Department of Social Services should issue a new "required" form which allows an agency to provide a tribe with all of the information on form SOC 319 and all of the information identified in part 23.11(d)(3) on one form.
As discussed above, we find DCFS complied with the notice requirements of the ICWA while this appeal was pending, and we will not reverse the dispositional order on this basis.

B. Notice to the Cherokee Tribes Was Sufficient.

Father also contends DCFS failed to comply with the notice requirements of the ICWA because it did not send notice of the proceedings to the United Keetoowah Band of Cherokee Indians. As set forth above, DCFS sent notice of the hearing to the BIA, the Blackfeet Tribe, the Cherokee Nation of Oklahoma, the Eastern Band of Cherokee Indians of North Carolina and the Cherokee of South East Alabama.[17] As listed in the Federal Register, the three federally "recognized" Cherokee Tribes are the Cherokee Nation of Oklahoma, the Eastern Band of Cherokee Indians of North Carolina, and the United Keetoowah Band of Cherokee Indians of Oklahoma.[18]
*588 In In re Edward H.,[19] the Court of Appeal reviewed a notice issue under the ICWA on facts quite similar to those in this case. There, the father told a social worker "he had reason to believe he belonged to ... the Choctaw Tribe."[20] The county community services agency made an inquiry and gave notice of the dependency proceedings to the BIA, "as agent for the Secretary of the Interior, the Choctaw Nation of Oklahoma and the Mississippi Band of Choctaw Indians."[21] Neither the BIA nor either of the two tribes "declared the children to be Indian within the meaning of the ICWA."[22] The juvenile court therefore ruled the ICWA did not apply, and it terminated parental rights.
On appeal, the mother asked the appellate court to reverse the order terminating her parental rights on the ground the county community services agency failed to comply with the notice requirements of the ICWA because it only gave notice to two of the three federally recognized Choctaw Tribes. The agency did not give notice to the Jena Band of Choctaw Indians.[23] The Court of Appeal concluded the agency complied with the notice requirements of the ICWA, holding "proper notice to some but not all possible tribes in which a dependent child may be eligible for membership does not violate the ICWA provided the agency also gives notice pursuant to 25 United States Code section 1912 to the [BIA]."[24] As the court pointed out, 25 United States Code section 1912(a) specifically authorizes service of notice upon the Secretary of the Interior when the agency cannot determine the identity or location of the tribe. The appellate court noted "the identity of the actual Choctaw Tribe in which [the children] might be eligible for membership was unknown."[25]
In this case, the children's mother said she was of Cherokee heritage, but she did not identify a specific Cherokee Tribe. DCFS gave notice of the proceedings to three Cherokee tribal entities, but only to two of the three federally recognized Cherokee Tribes. DCFS also gave notice to the BIA and asked it to confirm the children's status with the Cherokee and Blackfeet Tribes.[26] While we agree it would have been optimal if DCFS had given notice of the proceedings to all three of the federally recognized Cherokee *589 Tribes, we disagree with father's position the failure to do so constitutes noncompliance with the ICWA or prejudicial error, burden of identifying and providing notice to the proper tribe ... shifts from the Once DCFS sends notice to the BIA "the state court to the Secretary...."[27]
Because DCFS did not know which specific Cherokee Tribe the children might belong to, and it gave notice of the proceedings to the BIA, we conclude DCFS complied with the notice requirements of the ICWA. Father does not contend DCFS knew any information about the children's purported Cherokee lineage which it failed to disclose in its notices.

II.-IV.[**]

DISPOSITION
The jurisdictional finding regarding father's history of drug and alcohol use is reversed. The dispositional order is reversed to the extent it includes a substance abuse component. In all other respects, the dispositional order is affirmed.
We concur: PERLUSS, P.J., and WOODS, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976, subdivision (b) and 976.1, this opinion is certified for publication with the exception of parts II through IV.
[1] 25 United States Code section 1901 et seq.
[2] People v. Marsden (1970) 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44.
[3] The children's mother was a party to these dependency proceedings until she passed away in or about November 2001.
[4] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.
[5] Penal Code section 273d, subdivision (a).
[6] In re Kahlen W. (1991) 233 Cal.App.3d 1414, 1421, 285 Cal.Rptr. 507.
[7] In re Kahlen W., supra, 233 Cal.App.3d at page 1421, 285 Cal.Rptr. 507.
[8] In re Kahlen W., supra, 233 Cal.App.3d at page 1421, 285 Cal.Rptr. 507.
[9] In re Kahlen W., supra, 233 Cal.App.3d at page 1424, 285 Cal.Rptr. 507; In re Marinna J. (2001) 90 Cal.App.4th 731, 739, 109 Cal. Rptr.2d 267.
[10] See, e.g., In re H.A. (2002) 103 Cal.App.4th 1206, 1215, 128 Cal.Rptr.2d 12.
[11] In re Samuel P. (2002) 99 Cal.App.4th 1259, 1266, 121 Cal.Rptr.2d 820; see also In re Jeffrey A. (2002) 103 Cal.App.4th 1103, 1108, 127 Cal.Rptr.2d 314.
[12] 25 Code of Federal Regulations part 23.11(a), (d) and (e) (2001).
[13] In re H.A., supra, 103 Cal.App.4th at page 1211, 128 Cal.Rptr.2d 12, citing In re Desiree F. (2000) 83 Cal.App.4th 460, 474, 99 Cal. Rptr.2d 688.
[14] In re Dwayne P. (2002) 103 Cal.App.4th 247, 255, 126 Cal.Rptr.2d 639, quoting In re Junious M. (1983) 144 Cal.App.3d 786, 792, 193 Cal.Rptr. 40.
[15] 25 Code of Federal Regulations part 23.11(a) and (d) (italics added).
[16] California Rules of Court, rule 1439(d) ("The court and the county welfare department have an affirmative duty to inquire whether a child for whom a petition under section 300 is to be, or has been, filed is or may be an Indian Child").
[17] Father does not contend the notice DCFS provided to these Cherokee Tribes was deficient in any way.
[18] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 65 Federal Register 13298 (Mar. 13, 2000); In re Marinna J., supra, 90 Cal.App.4th at page 737, 109 Cal. Rptr.2d 267, citing 61 Federal Register 58211 (Nov. 13, 1996).
[19] In re Edward H. (2002) 100 Cal.App.4th 1, 122 Cal.Rptr.2d 242.
[20] In re Edward H., supra, 100 Cal.App.4th at page 4, 122 Cal.Rptr.2d 242.
[21] In re Edward H., supra, 100 Cal.App.4th at page 4, 122 Cal.Rptr.2d 242.
[22] In re Edward H., supra, 100 Cal.App.4th at page 4, 122 Cal.Rptr.2d 242.
[23] In re Edward H., supra, 100 Cal.App.4th at page 4, 122 Cal.Rptr.2d 242.
[24] In re Edward H., supra, 100 Cal.App.4th at page 4, 122 Cal.Rptr.2d 242.
[25] In re Edward H., supra, 100 Cal.App.4th at page 5, 122 Cal.Rptr.2d 242 (italics added).
[26] The cases father relies on are all distinguishable because they involve situations where the social services agency did not give proper notice of the proceedings to any of the tribes or to the BIA. (See In re Marinna J., supra, 90 Cal.App.4th at p. 736, 109 Cal. Rptr.2d 267; In re Desiree F., supra, 83 Cal. App.4th at pp. 464-465, 470, 99 Cal.Rptr.2d 688; In re Junious M., supra, 144 Cal.App.3d at p. 796, 193 Cal.Rptr. 40.)
[27] In re Kahlen W., supra, 233 Cal.App.3d at page 1422, 285 Cal.Rptr. 507; In re Desiree F., supra, 83 Cal.App.4th at pages 469-470, 99 Cal.Rptr.2d 688.
[**] See footnote *, ante.