16 Cal.Rptr.3d 514 (2004)
120 Cal.App.4th 900
In re ELIZABETH W., A Person Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Jackson W., Defendant and Appellant.
No. B172202.
Court of Appeal, Second District, Division One.
July 21, 2004.
*515 Michael A. Salazar, under appointment by the Court of Appeal, for Defendant and Appellant.
Larry Cory, Assistant County Counsel, and Kim Nemoy, Deputy County Counsel, for Plaintiff and Respondent.
VOGEL, J.
After years of bouncing from foster home to foster home, eight-year-old Elizabeth W. has a chance at a normal life as the adopted child of her present caregivers. The only thing standing between Elizabeth and the pot of gold at the end of her rainbow is her father's challenge to the Department of Children and Family Services' failure to comply with the notice requirements of the Indian Child Welfare Act. Because we must, we hold that Elizabeth's chance at stability will be delayed  but we publish this opinion with the hope that other children will fare better in the future, and that the Department and its lawyers will at some point learn to give the proper notices at the proper times, and to file the required documents with the dependency court, keeping in mind that childhood is brief and fleeting, as is a foster child's hope of finding and keeping a stable home.

FACTS
Jennifer J. and Jackson W. have five children, at least four of whom have at one time or another been dependents of the juvenile court. Our immediate concern is Elizabeth W., the youngest child, who came to the attention of the Department when she tested positive for cocaine at the time of her birth in August 1996. The *516 other children are Danny F., now 22 years old; Jackie W., who was adopted years ago and is now 16; Lena W., now 13 and living in a residential treatment center; and Latanya J., now 12 and placed with a legal guardian. Lena and Latanya were sexually abused by Jackson, their father.
The usual services were ordered for Jennifer and Jackson, including sexual abuse counseling for Jackson, and drug testing and counseling for Jackson and Jennifer. After two years in foster care, Elizabeth was returned to Jennifer in May 1998, on condition that Jackson not reside with them. In July 2000, the Department learned that Jackson was living with Jennifer and Elizabeth, a new petition was filed, Elizabeth was placed in foster care, and more reunification services were ordered for the parents.
Elizabeth's behavior deteriorated and she became so aggressive that her foster mother was unable to care for her. A new foster home was found in the fall of 2000. In April 2001, Jennifer entered a 30-day residential drug program. Jackson attended court-ordered counseling sessions, but refused to acknowledge his molestation of Lena and Latanya, which his therapist said "thwarted" his treatment and was "counter-productive." By that time, Elizabeth's violent tantrums and aggressive behavior at school and with her foster families had resulted in two more failed placements. A psychological evaluation was completed, and showed Elizabeth's intelligence as "high-average" but her emotional difficulties as severe.
Jennifer and Jackson showed no progress during the remaining months of 2001, and Elizabeth's condition deteriorated. She reported that she had been molested by Jackson (who continued to live with Jennifer), and she became overtly self-destructive (by compulsive self-mutilation). She was removed from yet another foster home and placed in several more homes. In October, Elizabeth was hospitalized due to "increasingly aggressive behavior" (she broke a mirror and used a shard of glass in an attempt to cut her tongue). The Department recommended placement in a residential treatment center. In November, reunification services were terminated for both Jennifer and Jackson, neither having made any progress, neither having complied with the case plan.
Following her discharge from the hospital, Elizabeth was placed in a group home. In April 2002, the Department reported that her condition had "stabilized," although her aggressive behavior had continued and she was again hospitalized after she kicked and hit a teacher. Elizabeth was discharged to the group home, then moved to Bienvenidos, a sheltered home where she attended a mental health day treatment program in lieu of school. By that time, Elizabeth had been diagnosed with depressive disorder, attention deficit disorder, and hyperactivity, and she was classified as an alleged victim of sexual abuse.
Medication and therapy stabilized Elizabeth's condition, and her Bienvenidos therapist reported that "Elizabeth's response to the Intensive Day Treatment [IDT] Program and to [p]harmacological intervention has been nothing short of remarkable. At the present time, virtually all of her presenting symptoms are in remission. Her present level of functioning has improved to such a degree that it is tentatively determined that she no longer needs the specialized services of the IDT . . . program." Among other things, the therapist recommended immediate reassessment for adoptability, a trial visit with her sister Jackie's adoptive family (Joe and Debbie H.), curtailment of Elizabeth's visits with her parents, placement in a residential treatment center, and testing for *517 appropriate placement in a traditional academic setting. In November, Elizabeth was placed at Five Acres.
By April 2003, Elizabeth, by then identified as a "special needs" child, had adjusted well to Five Acres, and her condition had "significantly stabilized." She was ready to return to public school, but she remained at Five Acres because Mr. and Mrs. H. had decided to pursue her adoption and the dependency court wanted to avoid multiple school changes. In June, Elizabeth was placed with Mr. and Mrs. H., where she quickly made a "very positive adjustment" to her new life. Jennifer's and Jackson's visits were limited to once every other week, and the required evaluations were ordered for Elizabeth, her parents, and her prospective adoptive parents. By August, Elizabeth's therapist, Mr. and Mrs. H., and the Department all favored a further reduction in parental visits to once per month.
By October, the therapists and Elizabeth were in agreement that, in preparation for her anticipated adoption, parental visits should be reduced to once every 60 days. The Department recommended termination of Jennifer's and Jackson's parental rights, termination of all parental visits, and adoption by Mr. and Mrs. H. (whose home study had been completed and approved).
In December, Jackson filed a petition (Welf. & Inst.Code, § 388) in which he asked the court to return Elizabeth to him, or to give him more visits, or to remove Elizabeth from the first stable home she had ever had in order to place her with a paternal cousin. He said he had participated in counseling, complained that Mr. and Mrs. H. wanted no contact with him  and claimed that Lena had "disclosed" that he never molested her. Jackson's petition was summarily denied, and a contested termination hearing was held over several days in December (Welf. & Inst.Code, § 366.26), at the conclusion of which the court found Elizabeth was adoptable and terminated Jackson's and Jennifer's parental rights. Jackson appeals from the orders denying his Welfare and Institutions Code section 388 petition and terminating his parental rights.

DISCUSSION

I.
Jackson contends the Department failed to comply with the notice requirements of the Indian Child Welfare Act (the ICWA, 25 U.S.C. § 1912), and that all of the dependency court's orders, from detention to termination, must be reversed. The Department claims there was substantial compliance but asks, should we find otherwise, that we conditionally reverse only the final order and not the others. We find there was no substantial compliance but conclude that, on the facts of this case, the appropriate remedy is a conditional reversal of only the final order of termination.

A.
At a hearing held on September 1, 2000, when Elizabeth was only four years old and living in a foster home, the court asked Jennifer, "Is there any American Indian heritage that Elizabeth may have, Ma'am?" Jennifer answered, "She's Black." The court acknowledged the obvious (Elizabeth's picture is in the record), then asked again, "But does she have any American Indian heritage?" Jennifer answered, "No." The court then posed the same question to Jackson, who first said "No," but then added this: "Well, my mother is Indian, but I don't know exactly, I think it's Blackfoot. I believe it is." As a result of this exchange, the court ordered *518 the Department to give notice to "the Blackfoot tribe."
In a report filed on October 27, the Department provided this information to the court: "Blackfeet Tribe Social Services, 304 N. Pigean, Mainstream Building, PO Box 588, Browning, Montana 59417, was noticed [sic] on 9/19/00. The tribe has not provided any information as to possible Native American status of Elizabeth." Although the Department submitted a copy of the notice, it did not submit a return receipt or any evidence to show the notice was sent by certified or registered mail, return receipt requested. The notice has Jackson's name and birthdate, but states that his birthplace is "unknown" (notwithstanding that the answer could have been obtained by a telephone call to Jackson).
In a report filed on December 11, the Department provided this additional information: "On 11/20/00, Blackfeet Tribe Social Services mailed to DCFS a Family Tree Chart to be filled out and return[ed] to Blackfeet Tribe Social Services with the names and information of the extended family members. On 11/28/00, the information was sent back to Blackfeet Tribe Social Services for further search." The "Family Tree Chart" was not submitted to the court, and the ICWA was not mentioned at the September hearing or, for that matter, at any later hearing. There is no receipt for the supposedly returned "Family Tree Chart," and nothing to show whether it was in fact completed or, if so, whether it was sent by certified or registered mail, return receipt requested.
Jackson's and Jennifer's parental rights were terminated and Elizabeth was freed for adoption, all without another word about the ICWA.

B.
The ICWA is designed to protect the interests of Indian children, and to promote the stability and security of Indian tribes and families. It sets forth the manner in which a tribe may obtain jurisdiction over proceedings involving the custody of an Indian child, and the manner in which a tribe may intervene in state court proceedings involving child custody. When the dependency court has reason to believe a child is an Indian child within the meaning of the Act, notice on a prescribed form must be given to the proper tribe or to the Bureau of Indian Affairs, and the notice must be sent by registered mail, return receipt requested. (In re C.D. (2003) 110 Cal.App.4th 214, 222, 1 Cal. Rptr.3d 578; In re Asia L. (2003) 107 Cal.App.4th 498, 506, 132 Cal.Rptr.2d 733; 25 U.S.C. § 1912(a).)
"`[T]o satisfy the notice provisions of the [ICWA] and to provide a proper record for the juvenile court and appellate courts, [the Department] should follow a two-step procedure' of sending proper notice to all possible tribal affiliations and filing with the court copies of the notices, the return receipts and any correspondence from the tribes." (In re L.B. (2003) 110 Cal.App.4th 1420, 1425, fn. 3, 3 Cal. Rptr.3d 16, quoting In re Marinna J. (2001) 90 Cal.App.4th 731, 739-740, fn. 4, 109 Cal.Rptr.2d 267; see also In re H.A. (2002) 103 Cal.App.4th 1206, 1215, 128 Cal. Rptr.2d 12; In re Asia L., supra, 107 Cal.App.4th at pp. 507-508, 132 Cal. Rptr.2d 733; In re Jennifer A. (2002) 103 Cal.App.4th 692, 702-703, 127 Cal.Rptr.2d 54.) Although the ICWA does not impose an obligation to file the receipts and correspondence with the court (In re L.B., supra, 110 Cal.App.4th at p. 1425, fn. 3, 3 Cal.Rptr.3d 16), the requirement has been adopted by our courts to "head off numerous appellate complaints of non-compliance with the ICWA...." (Ibid.)
*519 Where the record shows unequivocally that proper notice was given to the proper tribes and that responses were received, and the only omission is the failure to file a proof of service establishing that the notice and a copy of the petition were sent by certified mail, error will not be presumed and compliance will be deemed sufficient. (In re L.B., supra, 110 Cal.App.4th at pp. 1424-1425, 3 Cal. Rptr.3d 16; see also In re Levi U. (2000) 78 Cal.App.4th 191, 195-199, 92 Cal. Rptr.2d 648.) But where, as here, there is no more than a conclusory statement in the social worker's report that notice was sent, and the only document that was submitted to the court is incomplete, there is no substantial compliance with either the letter or the spirit of the ICWA. (See In re Asia L., supra, 107 Cal.App.4th at pp. 503, 507-509, 132 Cal.Rptr.2d 733 [social worker's testimony that she gave notice insufficient because copies of notice not submitted and because there was a question about whether the notice was given to the proper tribe]; In re Jennifer A., supra, 103 Cal.App.4th at pp. 698, 705, 127 Cal. Rptr.2d 54 [social worker's testimony that she sent notice insufficient to establish that proper notice was given because readily available family information was not given to the tribe]; In re Samuel P. (2002) 99 Cal.App.4th 1259, 1266, 121 Cal. Rptr.2d 820.)
In Jennifer A., the dependency court's file contained "no proof that notice was sent to the tribes, that it was properly served, or that it provided the information required by the ICWA.... [¶] ... No evidence regarding notice, receipt of notice, or any responses from the tribes or the [Bureau of Indian Affairs] was provided to the juvenile court." (In re Jennifer A., supra, 103 Cal.App.4th at pp. 702-703, 127 Cal.Rptr.2d 54.) When the notice was produced on appeal, it "indicated that the birthplaces of the mother and the father were unknown.... The mother and father were participating in the proceedings and may have been available to provide information about their birthplaces, ... and it would appear [the Orange County Social Services Agency] made little effort to provide the tribe with sufficient information for a thorough examination of tribal records." (Id. at p. 705, 127 Cal.Rptr.2d 54.) This is why the documents must be filed with the dependency court, which must then "review the information concerning the notice given, the timing of the notice, and the response of the tribe, so that it may make a determination as to the applicability of the ICWA, and thereafter comply with all of its provisions, if applicable." (Id. at pp. 703, 705, 127 Cal.Rptr.2d 54.)

C.
The omissions in our case surpass those described in the other cases. No return receipt was filed. The response received from the Blackfeet Tribe was not filed. The purported reply to the Tribe's response was not filed, nor was there any information about the manner in which that reply was supposedly sent. The social worker did not testify at any of the hearings, and the only statements in the record are her conclusory and uncorroborated comments in two review reports focusing on other matters. The Department has not explained its omissions, or offered to submit the missing documents to us to prove they were in fact sent and received, or attempted to mitigate the damage it has caused by sending a new notice while this appeal has been pending. (Cf. In re C.D., supra, 110 Cal.App.4th at p. 226, 1 Cal.Rptr.3d 578 [orders affirmed because the Department complied with the ICWA notice requirements while the appeal was pending].)
*520 Compliance with the ICWA is not a mere technicality, and the absence of notice in a case such as this means the order terminating Jackson's and Jennifer's parental rights must be conditionally reversed  and that Elizabeth's adoption must be postponed for however many months it takes for the Department to give proper notice, respond to the Blackfeet Tribe's questions, and satisfy the dependency court that, finally, it has complied with the ICWA. Until that is done, there remains the possibility, however slight we may believe it to be, that there is a sufficient connection to warrant the Tribe's intervention, and that Elizabeth's life will once again be turned upside down. Be that as it may, the law ignored by the Department must now be enforced by us.
It follows that the order terminating Jackson's and Jennifer's parental rights must be conditionally reversed, subject to automatic reinstatement if it is ultimately determined that Elizabeth is not an Indian child within the meaning of the ICWA. (In re Asia L., supra, 107 Cal.App.4th at p. 515, 132 Cal.Rptr.2d 733; In re Marinna J., supra, 90 Cal.App.4th at p. 740, 109 Cal.Rptr.2d 267; compare In re H.A., supra, 103 Cal.App.4th at p. 1215, 128 Cal. Rptr.2d 12.)[1]

II.
We summarily reject Jackson's challenge to the sufficiency of the evidence supporting the dependency court's finding that Elizabeth is adoptable. Aside from the fact that her prospective adoptive parents have jumped through all the required hoops and that Elizabeth is already living with them, the evidence summarized in our statement of facts shows that Elizabeth's problems are under control and that, save for the Department's inadequate handling of the ICWA notice, there is nothing standing between her and adoption. No more was required. (In re Lukas B. (2000) 79 Cal.App.4th 1145, 1154, 94 Cal. Rptr.2d 693; In re Sarah M. (1994) 22 Cal.App.4th 1642, 1649-1651, 28 Cal. Rptr.2d 82.)

DISPOSITION
The order terminating Jackson's and Jennifer's parental rights is conditionally reversed, and the cause is remanded to the dependency court with directions to conduct such further proceedings as are necessary to establish full compliance with the notice requirements of the ICWA. If, after receiving notice as required by the ICWA, no response is received from the Blackfeet Tribe indicating Elizabeth is an Indian child, or the responses received indicate Elizabeth is not an Indian child within the meaning of the Act, the order terminating parental rights shall be immediately reinstated and such further proceedings as are appropriate shall be conducted. If the Blackfeet Tribe determines that Elizabeth is an Indian child within the meaning of the Act, the dependency court shall proceed accordingly. In all other respects, the orders are affirmed.
We concur: SPENCER, P.J., and MALLANO, J.
NOTES
[1] The court inquired about Indian ancestry in September 2000, and that is when Jackson told the court about his mother. Jackson never again raised the issue or offered to provide more information, and this entire issue about noncompliance with the ICWA arose for the first time on appeal. Under these circumstances, we reject Jackson's contention that all orders (from detention to termination) should be reversed.