Filed 4/8/15  In re L.P. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re L.P., a Person Coming Under the Juvenile Court Law. | B258841<br>(Los Angeles County<br>Super. Ct. No. DK05022) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTORIA J.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Timothy M. O'Crowley, Principal Deputy County Counsel for Plaintiff and Respondent.

## INTRODUCTION

V.J. (mother), mother of one year old L.P., appeals from the juvenile court's jurisdictional findings and order that her substance abuse and mental health problems placed L.P. at risk of harm.[1]  She also contends that because the Department of Children and Family Services (Department) failed to comply with the notice provisions of the Indian Child Welfare Act (ICWA or Act) (25 U.S.C. § 1901, et seq.) with respect to L.P, Sr., L.P.'s father, the juvenile court erred in finding that the ICWA did not apply.  We affirm.

## BACKGROUND

The Department filed a petition under Welfare and Institutions Code section 300[2] that alleged, as ultimately sustained, that then 10-month old L.P. came within the jurisdiction of the juvenile court because mother had a history of substance abuse and was a current abuser of marijuana which rendered her incapable of providing L.P. regular care, and mother previously had been under the influence of marijuana while caring for and supervising L.P.  Mother's substance abuse, the petition alleged, placed L.P. at risk of harm.[3]  The petition further alleged that mother had mental and emotional problems that included a diagnosis of depression, post-traumatic stress disorder, and suicidal ideation that rendered her unable to provide L.P. regular care; father failed to protect L.P. from mother's mental and emotional problems; and mother's mental and emotional problems and father's failure to protect placed L.P. at risk of harm.

---

[1]     There is a reference to appealing the dispositional order in the notice of appeal and appellant's opening brief, but mother does not discuss the dispositional order.

[2]     All statutory citations are to the Welfare and Institutions Code unless otherwise noted.

[3]     The petition also contained allegations that mother had homicidal ideations and she and father engaged in domestic violence, which allegations the juvenile court struck. Accordingly, except as necessary for context, we do not set forth the facts underlying those allegations as they are not relevant to the issues on appeal.

The Department's May 14, 2014, Detention Report reported that the Department received, on May 9, 2014, an immediate response referral that said that mother had "dropped off" L.P. stating that she was "surrendering" him because she could not "take it anymore." Mother told the reporter that she had called the police because father was verbally harassing her, but the police were unable to assist her as father's conduct did not constitute domestic violence. The reporter said that the police did not feel safe leaving L.P. under mother's care and they transported mother and L.P. to St. Francis Hospital. While at the hospital, mother said that if L.P. was going to remain in her care, then father could not be involved in the child's life. If father was going to care for L.P., then he would do so without mother's involvement. Mother later stated that she did not want father to care for L.P. and she wanted to "surrender" him.

In an interview with a social worker at the hospital that same day, mother said that she was in the process of moving and, although she did not want father to participate in her move, she had asked father to care for L.P. for a short period of time while she packed. Father did not give mother sufficient time to pack, and left L.P. with her. Mother was unable to pack because L.P. was in the way which caused her to argue with father. Mother told the social worker that she began to have suicidal ideations and father advised her to call 911. Mother contacted law enforcement. In the same conversation, mother denied having suicidal ideations. Mother said that she and father were unable to co-parent and that it was in L.P.'s best interest that either she or father cared for L.P. without the other parent's involvement. She later said that she would prefer L.P. being placed in foster care to being released to father.

Mother said that she had been diagnosed with depression and post-traumatic stress disorder. While enlisted in the Navy, mother had been raped. Mother was receiving mental health services through the Department of Veterans' Affairs and was a patient at the Women's Clinic and Women's Mental Health. She had been prescribed Sertraline and was compliant with her prescription.

Previously, mother had been enrolled in school and attended classes while father cared for L.P. Mother stopped attending classes due to a stressful relationship with father

3

and her becoming depressed. Mother attempted to cope with her stress by visiting friends. Father had an issue with mother's friends, suspecting them of drug use, and called mother's phone repeatedly. Mother said that she felt that she was abusing L.P. by remaining in contact with father and that she "could become a 'Chester the molester' or murder several people if they continue[d] to have contact with each other." She said that she had never physically harmed L.P. or had any thoughts of harming him.

Mother admitted that she used marijuana and that she had been discharged from the Navy for using marijuana. When L.P. was not in her care, mother typically used marijuana daily. She said she previously had a medical marijuana card, but that it had expired the prior year and she had not renewed it. Mother denied using other drugs and said that L.P. did not have access to drug paraphernalia in the home.

Mother accused father of trying to manipulate her because she did not want to be in a relationship with him any longer. She said that father and paternal grandparents had threatened to take L.P. away from her from the time she became pregnant.

The social worker gave mother her contact information, but mother said that she probably would not contact the social worker. After initially stating that she was willing to participate in services, mother changed her mind and said that she would not see L.P. again. Mother became angry and said that "this" is why she had suicidal ideations. Mother "stormed" out of the hospital without being discharged, and hospital security was unable to stop her. According to a hospital social worker, because mother had not disclosed any thoughts of harming herself or L.P., she would have been discharged from the hospital.

Father told the social worker that he had been caring for L.P. while mother moved. Mother lost her cell phone, became frustrated, and kicked him out of her home. Father later received a call from mother during which she "threatened" to call the police because she was feeling suicidal. Father returned to mother's home because he did not feel comfortable leaving mother alone. He stated that he did not believe that mother was emotionally stable and that he wanted her to get the mental health services she needed. Father reported that mother did not take her medication regularly and that she had

4

"cancelled several appointments." According to father, mental health illness ran in mother's family—her mother had been diagnosed with schizophrenia and one of her brothers had a "mental health diagnosis."

Paternal grandmother told the social worker that mother had mental health issues, describing her as "psychotic." Mother had gotten in verbal confrontations with a number of family members—mother "cursed . . . out" paternal grandmother "to the point where law enforcement had to intervene." She was concerned about L.P. when he was in mother's care. Paternal grandmother believed that mother was emotionally unstable and should not have been caring for L.P. One month prior to the interview, mother contacted paternal grandmother while L.P. was visiting and said that paternal grandmother "could keep" him. Paternal grandmother also was concerned about mother's marijuana use.

The report stated that the ICWA did or might apply as father had signed an Indian Ancestry Questionnaire indicating that he had Blackfoot and Cherokee Indian ancestry. Mother reported that she had Navaho Indian ancestry. Father also filed a Parental Notification of Indian Status form on which he indicated that he might have Indian ancestry, again identifying the Blackfoot and Cherokee tribes.

At the detention hearing, the juvenile court found a prima facie case for detaining L.P. It detained L.P. from and released him to father. The juvenile court stated that father had indicated that he might have Blackfoot and Cherokee ancestry. The juvenile court ordered the Department to give notice to the Blackfoot and Cherokee tribes, the Bureau of Indian Affairs, and the Secretary of the Interior regarding father's ICWA issues. It further ordered the Department to investigate any ICWA issues with respect to mother and to give notice to any identified tribes and the appropriate agencies.

The Department's June 17, 2014, Jurisdiction/Disposition Report reported mother's version of the incident with father on May 9. Mother said that father knew that she was moving and had to pack. She asked father to take L.P. so she could pack, but father refused. Mother "guessed" that her "anxiety went through the roof" because she had not taken her medication for a couple of weeks.

5

With respect to the allegations concerning mother's drug use, the report states that mother admitted that she "indulged in weed. I do use weed if I run out of medication." Mother said that father had never left L.P. with her when she was under the influence of marijuana. She "figured there was no need to get a card" because she had sought mental health treatment. Mother stated that she was under a psychiatrist's care; that she had been diagnosed with mood disorder, post-traumatic stress disorder, and depression due to sexual assault while she was in the military; and that she had been prescribed Zoloft and a sleep aid. According to mother, although she had "always been on [her] medication," she sometimes stopped taking it for two weeks during which periods she took marijuana to help with her anxiety and appetite. She said that she usually used marijuana when L.P. was with father and that she did not use it every day. Mother believed that she first used marijuana in 1996 due to sexual trauma she suffered while she was in the Navy.

As to the allegations concerning mother's mental health, the report stated that mother said that L.P.'s life had never been in danger. She had never been suicidal or at a point where she was unable to care for L.P. Mother only went to the hospital because the police kept asking her about "being assessed." Mother explained that she was moving and had just had a miscarriage and her "emotions were all over the place." Her diagnoses had never affected her parenting skills. That is why she continued with treatment.

According to the report, father said that mother did not smoke marijuana in his presence and he would not permit her to smoke marijuana in L.P.'s presence. He had not seen mother "high" while caring for L.P. and did not believe that she smoked marijuana in L.P.'s presence.

Father said that he had never heard mother make a statement about being suicidal. Asked about mother's attempt to "surrender" L.P., father said that mother was under a lot of stress and was upset because she thought that father was trying to drop off L.P. and leave. When told of the consequences of "surrendering" L.P., mother had changed her mind. With respect to mother's mental health issues, paternal grandmother explained that when she had described mother as "psychotic," she really meant "bi-polar."

6

At the initial jurisdiction hearing, the juvenile court stated that mother had completed an "ICWA form" and that father had indicated to the Department that he might be registered with the Blackfoot or Cherokee tribes. Mother's Parental Notification of Indian Status form stated that she did not have any Indian ancestry. The juvenile court stated, "Well mother said no. So I'm going to go with the no." Apparently referring to the tribe to which mother claimed an affiliation, mother's counsel stated that mother had said she had no Indian ancestry because "it's not federally recognized." Father's counsel stated that father informed the dependency investigator that he might have Indian ancestry, but to his knowledge "no one" was registered. The juvenile court ruled, "[B]ased upon the answers I have received, the court finds the court has no reason to know the Indian Child Welfare Act applies or that [L.P.] is an Indian child." The matter was continued for a contested jurisdiction hearing.

In its August 19, 2014, Interim Review Report, the Department reported that mother had provided a written schedule of three mental health appointments at the "VA" office in Long Beach. Mother said she had two appointments in July for medication management and one appointment for a psychological orientation session that was a required initial step in receiving counseling services. The Department had requested the name of and contact information for mother's therapist or psychiatrist, but mother had not provided that information. Mother said that she had been prescribed Sytraline, sleeping aids, and blood pressure medication. According to the Department, mother had not "submitted to any test after being court ordered."

In an August 19, 2014, Last Minute Information for the Court, the Department reported that mother's "gain" worker said that on August 12, 2014, mother was tested for substance abuse and mental health and scored "HIGH" on substance abuse. Mother was referred for a substance abuse assessment at a treatment center on August 28, 2014. Mother scored "Voluntary (not a clinical assessment)" for mental health.

At the contested jurisdiction hearing, the juvenile court sustained the substance abuse and mental and emotional health allegations and declared L.P. to be a dependent of the juvenile court. It ordered that L.P. remain placed with father.

7

## DISCUSSION

### I. The ICWA

Mother contends that the juvenile court erred in ruling that the ICWA did not apply. She argues that the Department failed to comply with the ICWA's notice provisions with respect to father's claimed Indian ancestry.[4] The Department contends that because L.P. was placed with father—i.e., with one of L.P.'s parents, this case is not an "Indian child custody proceeding" in which the ICWA notice provisions must be given. We agree with the Department.

#### A. *Background*

At the time of the detention hearing, father filed a Parental Notification of Indian Status form on which he indicated that he might have Indian ancestry, identifying the Blackfoot and Cherokee tribes. In its report for the detention hearing, the Department stated that the ICWA did or might apply because father had signed an Indian Ancestry Questionnaire indicating that he had Blackfoot and Cherokee Indian ancestry. At the detention hearing, the juvenile court ordered the Department to give notice to the Blackfoot and Cherokee tribes, the Bureau of Indian Affairs, and the Secretary of the Interior regarding father's ICWA issues. The juvenile court ordered L.P. placed with father. The record on appeal does not contain any of the ordered ICWA notices or any responses.

At the initial jurisdiction hearing, father's counsel said that father informed the dependency investigator that he might have Indian ancestry, but to his knowledge "no one" was registered. The juvenile court ruled, "[B]ased upon the answers I have received, the court finds the court has no reason to know the Indian Child Welfare Act applies or that [L.P.] is an Indian child." The juvenile court ordered that L.P. remain placed with father.

---

[4] Although mother initially claimed to have Indian ancestry in the Navaho tribe, she does not claim on appeal that the juvenile court erred in ruling that the ICWA did not apply with respect to her claimed Indian ancestry.

B. *Application of Relevant Principles*

"In 1978, Congress passed the Act, which is designed to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children 'in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.'" (*In re Marinna J.* (2001) 90 Cal.App.4th 731, 734, quoting 25 U.S.C. § 1902.) The Act "sets forth the manner in which a tribe may obtain jurisdiction over proceedings involving the custody of an Indian child, and the manner in which a tribe may intervene in state court proceedings involving child custody. When the dependency court has reason to believe a child is an Indian child within the meaning of the Act, notice on a prescribed form must be given to the proper tribe or to the Bureau of Indian Affairs, and the notice must be sent by registered mail, return receipt requested. [Citations.]" (*In re Elizabeth W.* (2004) 120 Cal.App.4th 900, 906.) To enable the juvenile court to review whether a child dependency agency supplied sufficient information to determine a child's Indian ancestry, the agency must file in the juvenile court the ICWA notices it sent and the responses from the tribe and the Bureau of Indian Affairs. (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703.)

"An 'Indian child custody proceeding' . . . is defined by section 224.1, subdivision (c) [now subdivision (d)], as 'a "child custody proceeding" within the meaning of Section 1903 of [ICWA], including a proceeding for temporary or long-term foster care or guardianship placement, termination of parental rights, preadoptive placement after termination of parental rights, or adoptive placement.' This list does not include a proceeding in which a dependent child is removed from one parent and placed with the other. Similarly, the ICWA definition referenced in section 224.1 (25 U.S.C. § 1903) does not refer to placement with a noncustodial parent."[5] (*In re J.B.* (2009) 178

---

[5] Section 1903 of ICWA (25 U.S.C. § 1903) provides: "(1) 'child custody proceeding' shall mean and include—[¶] (i) 'foster care placement' which shall mean any action removing an Indian child from its parent or Indian custodian for temporary

Cal.App.4th 751, 757 & 758, 760 [holding that section 361, subdivision (c)(6), which provided that an Indian child could not be removed from a parent's custody without a finding, supported by expert testimony, that continued parental custody was likely to result in serious emotional or physical damage to the child, did not apply when the child was placed with the child's other parent because such a case was not an "Indian child custody proceeding"].)

"[T]he legislative intent behind ICWA expressly focuses on the removal of Indian children from their *homes and parents*, and placement in *foster or adoptive homes*." (*In re J.B., supra,* 178 Cal.App.4thh at p. 759.) The notice provisions of the ICWA "com[e] into play when the Agency seeks foster care placement and the juvenile court has reason to believe the child is an Indian child. (25 U.S.C. § 1912(a) ['In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, *the party seeking the foster care placement of . . . an Indian child shall* notify the parent or Indian custodian and the Indian child's tribe. . . .']; 25 C.F.R. § 23.11(a) (2009); see, e.g., *In re Alexis H.* (2005) 132 Cal.App.4th 11, 15 [33 Cal.Rptr.3d 242 [because agency sought neither foster care nor adoption ICWA seemingly did not apply]; *In re Jennifer A.* (2002) 103 Cal.App.4th 692, 699-701 [127 Cal.Rptr.2d 54] [although child ultimately placed with father, ICWA applied where child was initially in foster care and agency sought continued foster care placement]; see also . . . *Interest of J.R.H.* (Iowa 1984) 358 N.W.2d 311, 321-322.)" (*Ibid.*)

---

placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated; [¶] (ii) 'termination of parental rights' which shall mean any action resulting in the termination of the parent-child relationship; [¶] (iii) 'preadoptive placement' which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and [¶] (iv) 'adoptive placement' which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption. [¶] Such term or terms shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime or upon an award, in a divorce proceeding, of custody to one of the parents."

Because the juvenile court ordered L.P. placed with father—i.e., with one of L.P.'s parents, this case is not an "Indian child custody proceeding" in which the ICWA's notice provisions apply. (See *In re J.B., supra,* 178 Cal.App.4th at pp. 757-760.) Accordingly, the juvenile court did not err. If the Department seeks to terminate mother's and father's parental rights or seeks a placement of L.P. that causes this case to be an "Indian child custody proceeding," then the ICWA's notice requirements will apply (see *id.* at p. 760; § 224.1, subd. (d); 25 U.S.C. § 1903) and compliance with those requirements evaluated.

## II.     Mother's Mental and Emotional Problems

Mother contends that substantial evidence does not support the juvenile court's jurisdictional finding and order based on her mental and emotional problems. Substantial evidence supports the finding and order.

### A.     *Standard of Review*

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) Substantial evidence is evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could make the challenged findings. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924.) In reviewing whether substantial evidence supports a jurisdictional finding, "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court. [Citation.]" (*In re Heather A., supra,* 52 Cal.App.4th at p. 193.)

### B.     *Application of Relevant Principles*

Section 300, subdivision (b)(1) provides that there is juvenile court jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the inability of

11

the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness . . . ." The juvenile court does not need to wait until a child is seriously injured to assume jurisdiction and take the steps necessary to protect the child. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)

The following is evidence in the record. Mother was diagnosed with depression and post-traumatic stress disorder. She was receiving treatment and had been prescribed medications for her maladies. Mother did not always take her medications, however, and instead self-medicated with marijuana. Mother told a social worker that she had suicidal ideations after arguing with father because he would not care for L.P. when she was packing to move. Mother called 911, and the police took mother and L.P. to the hospital after determining that it was not safe to leave L.P. under mother's care. At the hospital, mother attempted to "surrender" L.P. (About one month earlier, mother had tried to relinquish care of L.P. to paternal grandmother.) Later, mother told the social worker that she would not participate in services and would not see L.P. again. Mother became angry and said that "this" was why she had suicidal ideations. She then stormed out of the hospital without being discharged. In later describing the events of that day, mother guessed that her anxiety had gone "through the roof" because she had not taken her medication for a couple of weeks. At the time of the jurisdiction hearing, L.P. was only one year old.

The evidence adduced in the juvenile court shows that mother has specific, diagnosed mental health issues, that she has been prescribed medication for those diagnoses, and that she has not always taken her medications. When angry or not on her medications, mother has had suicidal ideations. Such evidence constitutes substantial evidence that mother's mental health problems render her incapable of providing regular care to L.P. and create a substantial risk that L.P. will be harmed, especially given L.P.'s tender age. Accordingly, substantial evidence supports the juvenile court's jurisdictional finding and order based on mother's mental and emotional problems. Because substantial evidence supports the juvenile's court jurisdictional finding and order based on mother's mental and emotional problems, we need not consider whether substantial

12

evidence also supports the juvenile court's jurisdictional finding based on mother's substance abuse.  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492 ["an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence"].)

## DISPOSITION

The jurisdictional findings and order are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, Acting P. J.


We concur:


KRIEGLER, J.


GOODMAN, J.*

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.