Filed 12/28/15  In re T.B. CA2/6
(second of 2 modifications)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re T.B. III, a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B260826 (Consolidated with B262032 & B262711) (Super. Ct. No. 14JV-00040) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. L.S. et al., Defendants and Appellants. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [CHANGE IN JUDGMENT] |

THE COURT:

The opinion filed in the above-entitled action on December 1, 2015, is modified as follows:

1.  On page 2, line 4, the sentence stating, "We affirm" is deleted and replaced with the following:

We shall order a limited reversal for ICWA compliance.  Otherwise, we affirm.

2.  On page 12, at the end of the first paragraph, the sentence stating, "We disagree" is deleted and replaced with the following:

After the briefs were filed, the parties stipulated to a limited reversal for re-noticing of the Nez Perce tribe.  We shall order such a limited reversal.  We agree with DSS, however, that the ICWA notice was proper as to the other noticed tribes.

3.  On page 13, footnote 6 (which begins "Prior to oral argument") is deleted in its entirety.

4.  On page 14, the sentence beginning, "The order terminating father's parental rights" is deleted and replaced with the following:

DISPOSITION

The order terminating parental rights is conditionally reversed.  The matter is remanded to the juvenile court with directions to ensure that the Nez Perce tribe has received proper ICWA notice.  If, after receiving notice under ICWA, the Nez Perce tribe indicates T.B. III is not an Indian child within the meaning of the statutory scheme, the juvenile court shall reinstate the order terminating parental rights.  In all other respects, the judgment is affirmed.

This modification changes the judgment.

Appellant's petition for rehearing is denied.

2

Filed 12/3/15  In re T.B. CA2/6 (first of 2 modifications)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re T.B. III, a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B260826 (Consolidated with B262032 & B262711) (Super. Ct. No. 14JV-00040) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY CHILD PROTECTIVE SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> L.S. et al., <br><br> Defendants and Appellants. | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

The court on its own motion modifies the opinion filed herein on December 1, 2015, to change the name of the Plaintiff and Respondent in this case from "Santa Barbara County Child Protective Services" to "San Luis Obispo County Child Protective Services."

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re T.B. III, a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B260826 (Consolidated with B262032 & B262711) (Super. Ct. No. 14JV-00040) (San Luis Obispo County) |
| SANTA BARBARA COUNTY CHILD PROTECTIVE SERVICES, Plaintiff and Respondent, v. L.S. et al., Defendants and Appellants. | |

   T.B. Jr. (father) appeals the juvenile court's order terminating parental rights to his minor son T.B. III (T.B.) and selecting adoption as the child's permanent plan.  (Welf. & Inst. Code,[1] § 366.26).  T.B.'s paternal grandmother L.S. (grandmother) appeals the denial of her section 388 petition requesting that T.B. be

---

[1] All statutory references are to the Welfare and Institutions Code.

placed with her.[2]  Father contends the court failed to comply with the notice requirements of the Indian Child Welfare Act (ICWA), (25 U.S.C. § 1901, et seq.). Grandmother contends the court abused its discretion in denying her section 388 petition.  We affirm.

FACTS AND PROCEDURAL HISTORY

Four days after T.B.'s birth in February10, 2014,[3] the San Luis Obispo County Department of Social Services (DSS) filed a section 300 petition alleging that he had tested positive for amphetamines at birth and that his mother C.B. (mother)[4] gave birth to him while under the influence of drugs and alcohol.  Father was in jail at the time for his second violation of a restraining order issued after he kicked mother in the stomach while she was pregnant.

At the detention hearing, DSS reported that "[r]elative placements identified by the parents were contacted, but voiced that they would need additional time to make a decision."  T.B. was placed in a foster home.

Both parents completed and signed a Parental Notification of Indian Status (ICWA-020).  Father indicated he may have Indian ancestry through the Cherokee and/or Blackfeet tribes.  Although mother had no knowledge of any Indian ancestry, the maternal great-grandmother, who was also present at the hearing, stated

---

[2] Grandmother also filed a notice of appeal from the order terminating parental rights.  On our own motion, we designated that appeal (B260826) as the lead case and consolidated it with father's appeal from the same order (B262032) and grandmother's appeal from the order denying her section 388 petition (B262711).  In our consolidation order, we also directed the parties the address in their briefs whether grandmother had standing to challenge the order terminating parental rights.  In her briefing, grandmother stated that she was limiting her appeal to the order denying her section 388 petition, and thereby effectively abandoned her appeal from the parental termination order.

[3] Unless otherwise specified, all further year references are to the year 2014.

[4] Mother is not a party to this appeal.

that both she and her husband were "part American Indian." She identified her husband's tribal affiliation as Comanche and her own as Nez Perce, but she "[did]n't have any verification of that." She did not know if her husband's Indian heritage came from his birth state of Texas and offered that "[w]e are both a very small portion of it." The maternal great-grandmother believed that her Indian heritage came from her maternal grandfather and gave his name and state of birth. She added that she had "some genealogy papers" and would "look in earnest for that." No additional information was produced, but she completed an ICWA-020 form indicating that T.B. may have Comanche and Nez Perce ancestry.

At the conclusion of the detention hearing, T.B. was ordered detained and the matter was set for a combined jurisdiction and disposition hearing. In its report for that hearing, DSS stated that "[r]elative placements will continue to be assessed. On February 18, 2014, [the maternal grandmother] reported she could not be a placement but may be interested in concurrent planning. [¶] On March 10, 2014, [grandmother] reported she may want to care for [T.B.] and had made plans to discuss [*sic*] with her significant other. It is unclear at this time if historical factors or concurrent circumstances may prevent [grandmother] from being assessed as an appropriate placement, but the Department will move forward with assessment if requested by [grandmother]. . . ." The maternal grandmother said her family did not want T.B's permanency to be delayed any further and wanted him to be "placed with prospective adoptive parents."

Mother and father were apparently still living together in violation of the restraining order and that neither of them had visited T.B. since his removal. DSS nevertheless recommended that mother be offered reunification services and that father be offered services if he were found to be T.B.'s presumed father rather than merely an alleged father.

At the conclusion of the jurisdiction and disposition hearing, mother was awarded supervised weekly visitation and was ordered to comply with DSS's

3

recommended case plan. The court also awarded visitation for grandmother, who was present at the hearing and offered that she had recently left a voicemail message with the social worker "about wanting to take the baby . . . ." No services or visitation were offered to father because he had yet to establish he was the presumed father of T.B. The three-month review hearing was set for June, and the six-month review hearing was set for September. In April, father was declared T.B.'s presumed father.

In May, the social worker made an early-evening unannounced visit at grandmother's home after receiving information that excessive alcohol was being consumed there. Grandmother answered the door and said she and her boyfriend were sleeping. Grandmother had a "slight odor" of alcohol. She allowed the social worker to enter the house and offered that she "ha[d] nothing to hide." The social worker entered the house and met grandmother's boyfriend, who had a flushed face. The social worker found three cases of beer in a refrigerator in the garage along with numerous empty beer cans in a recycling bin. Grandmother claimed that the beer and empty cans were there because they had a barbeque the previous night.

The social worker's report of her visit at grandmother's house was included in DSS's report for the three-month review hearing. It was also reported that grandmother was shaking and had slurred speech on more than one of her interactions with the social worker. DSS also continued to receive reports of alcohol abuse by grandmother, her live-in boyfriend, and her teenage daughter. Grandmother had requested that T.B. be placed with her and had initiated the process for resource family approval (RFA) (§§ 361.2, subd. (e)(4), 16519.5) through foster care licensing with DSS, but her application was yet to be completed and DSS remained concerned about the grandmother's ability to attend to T.B.'s special needs. Moreover, grandmother had only visited T.B. once during the entire three-month review period.

DSS also reported that friends of the maternal grandmother (the prospective adoptive parents) had identified themselves as a potential nonrelated extended family member (NREFM) placement for T.B. Although mother and father

4

had not visited T.B. since his detention or participated in services, DSS recommended that they both be offered services for an additional three months.

In early June, DSS mailed ICWA 030 notices of the three-month review hearing to the United Band of Cherokee Indians in Oklahoma, the Eastern Band of Cherokee Indians, the United Keetowooah Band of Cherokee, the Comanche Nation, the Blackfeet Tribe of Montana, and the Nez Perce Tribe of Idaho. The notices included the parents' names, addresses and dates of birth, the names and dates and places of birth of grandmother, the maternal grandfather, and the maternal great-grandmother and great-grandfather, and the name and place of death of the paternal great-grandmother. The return receipts from all six tribes were filed with the court prior to the three-month review hearing. DSS also filed the responses of five of the tribes indicating that T.B. was neither a member nor eligible to become a member of their tribe. The Nez Perce tribe did not respond.

At the conclusion of the three-month review hearing, the court found that the ICWA notice requirements had been satisfied and that the ICWA did not apply. The court then adopted DSS's recommendations and set the matter for a six-month status review hearing three days prior to the six-month review hearing in September.

In July, grandmother filed a de facto parent request (JV-295) as to T.B. In a supporting declaration, grandmother stated she was visiting with T.B. for an hour every other week and claimed she and her boyfriend had "completed all of the requirements needed to attain legal custody of" the child. She also claimed that she and her daughter had overheard the two social workers assigned to the case discussing a plan to cast grandmother as an alcoholic as a result of her prior DUI conviction and have a third party adopt T.B. in exchange for "a finders [*sic*] fee of $10,000.000 in cash . . . ."

The court set a hearing on grandmother's de facto parent request and ordered DSS to submit a written response. DSS opposed the request on the ground it contained inaccurate information and because grandmother's "contact and relationship

5

with the minor does not rise to the level of De Facto Parent status as there have been less than 10 visits total at one house [with] each visit supervised by the current foster parent." DSS also noted that grandmother and her boyfriend had requested that T.B. be placed with them, but they could not be formally assessed because they had yet to complete the requirements for such a placement.

Both social workers filed declarations in opposition to grandmother's de facto parent request. One recounted a February telephone conversation with grandmother in which grandmother said she did not want to be considered for relative placement but "may be interested in concurrent planning." Grandmother sounded intoxicated when she made a call to the after-hours social worker six days later. When the social worker confronted grandmother with this, she denied being intoxicated and claimed she was merely crying. Both social workers denied there was a scheme to "sell" T.B., but acknowledged they had referred to grandmother's alcohol abuse during a conversation in the hall prior to the jurisdiction and disposition hearing in March. It was also noted that grandmother was only an alleged grandmother at the time and that other relatives and an NREFM had expressed an interest in having T.B. placed with them.

In conjunction with the hearing on grandmother's request for de facto parent status, DSS filed another report indicating that it had completed a placement assessment for grandmother but was "unable to approve [grandmother] and her partner as a placement option for [T.B.]" The report stated that grandmother had received a certified letter informing her of this and had signed the return receipt. DSS also disputed numerous factual assertions in grandmother's response.

At the conclusion of the hearing, the court found that grandmother did not qualify for de facto parent status and denied her request.

In its report for the six-month status hearing, DSS recommended that reunification services be terminated as to both parents, whose whereabouts were unknown, and that the matter be set for a section 366.26 hearing. The report stated

6

that T.B. was transitioning into the home of his prospective adoptive parents, who were "willing to maintain family bonds if they were to provide permanency to [T.B.]" Although grandmother had initiated the RFA process, she and her boyfriend had yet to complete that process. DSS also stated that "[a]lthough the RFA process has not been completed, the Department has assessed [grandmother and her boyfriend] for placement. Considering [T.B.]'s physical, psychological, educational, medical, and emotional needs, the Department does not believe it is in [T.B.]'s best interests to be placed in the care of [grandmother]. The Department has conducted a thorough assessment and background check of both [grandmother] and [grandmother's boyfriend] and due to issues found in those processes, this placement cannot be approved by the Department." Grandmother had also missed or rescheduled visits with T.B. and told the foster parent she planned to "get the social worker in trouble . . . ."

At the six-month review hearing, father's counsel asked if he could question the social worker regarding DSS's decision to deny placement with grandmother. The social worker testified that although grandmother had informed her that she was no longer living with her boyfriend, grandmother's "[c]hild welfare and criminal history" precluded DSS from approving T.B.'s placement with her. In light of that information and other relevant factors, DSS decided not to seek a criminal records exemption (§ 361.4, subd. (d)(2)). In response to questioning by the court, grandmother said that some of the information in the DSS report was true while "some of it wasn't" and claimed she had "not been in any kind of trouble with the law" except for her DUI conviction in 2000. She also asked the court to "further review" the placement determination and noted that she "currently run[s] two businesses" and "take[s] care of [her] daughter." The court noted that the issue of placement was not before the court and advised grandmother to confer with father's counsel "about the different options and how you can potentially bring the issue that you want before the court."

7

At the conclusion of the hearing, the court terminated reunification services for both parents and set the matter for a section 366.26 hearing. Two days later, grandmother filed a section 388 petition on form JV-180 requesting that court change its prior order and place T.B. with her. She claimed that circumstances had changed in that her adult son and his partner had moved out of her house and that she wanted T.B. to be placed with her so they could "start a bond" and "[b]ecause it would be healthier for [T.B.] to grow up within his biological family . . . ."

The court ordered DSS to file a response and set the matter for a hearing. At that hearing, DSS argued that grandmother' motion was facially insufficient and reiterated that she had been rejected as a placement for T.B. The social worker testified that after father was declared the presumed father she "had [grandmother] complete the assessment over the phone and that was passed on to licensing who starts the RFA . . . ." Contrary to grandmother's claim, she had yet to complete the RFA process. T.B. had moved into his prospective adoptive home a month earlier. Moreover, during her visits grandmother never inquired about T.B.'s substantial medical needs and had to be told how to interact with him. DSS also offered the letter sent to grandmother informing her that her request that T.B. be placed with her had been rejected due to, among other things, her prior DUI conviction and "ongoing concerns as to alcohol use in [her] home . . . ."

Grandmother testified at the hearing that she had turned in all the required paperwork for RFA the previous September. She also claimed that she rarely drank alcohol and that the party at her house took place shortly before the social worker made her unannounced visit.

The court accepted an offer of proof that grandmother's RFA application remained incomplete and that DSS had received a community complaint that "there were copious amounts of alcohol in [grandmother's] home (and) that the family drinks every night." It was also established in an offer of proof that grandmother had been given preferential placement consideration after father was declared the presumed

8

father, and that grandmother's background check (which included a DUI conviction and recent reports of alcohol abuse and potential domestic violence) led DSS to conclude that T.B.'s placement with her would not be in his best interests.

After taking the matter under submission, the court denied grandmother's section 388 petition on the grounds that she had failed to establish either a change in circumstances or that placing T.B. with her would be in the child's best interests. The court found that DSS had complied with relative placement preference requirements set forth in subdivision (a) of section 361.3, and addressed factors relevant to its determination that grandmother was not a suitable placement for T.B. Although the court was not pleased with the fact that the social workers had discussed grandmother's purported alcohol problems in the hallway such that grandmother was able to hear them, it noted that instead of heeding that knowledge grandmother hosted a barbeque at which a great deal of alcohol was consumed. The court also criticized DSS for its delay in notifying grandmother of its placement decision, yet noted that grandmother had received such notice and did not request a stay of the court's placement order.

Father appeared for the first time in this case at the February 2015 section 366.26 hearing. Moreover, he only appeared to state through his attorney that he wanted grandmother to adopt T.B. At the conclusion of the hearing, the court found that T.B. was likely to be adopted and terminated parental rights.

DISCUSSION

*Grandmother's Appeal*

Grandmother contends the court abused its discretion in denying her section 388 modification petition. We conclude otherwise.

As relevant here, section 388 provides that any person with an interest in a dependency proceeding may petition for a hearing to change or set aside an order on the ground of changed circumstances. (*Id.* at subd. (a)(1).) The petitioning party bears the burden of proving by a preponderance of the evidence that circumstances have

9

changed and that the requested change would be in the child's best interests. (*Id.* at subd. (b); *In re D.B.* (2013) 217 Cal.App.4th 1080, 1089.)

"A ruling on a section 388 petition is 'committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]' [Citation.] Thus, we may not reverse unless the juvenile court exceeded the bounds of reason, and we have no authority to substitute our decision for that of the lower court where two or more inferences can reasonably be deduced from the facts. [Citation.]" (*In re D.B.*, *supra*, 217 Cal.App.4th at pp. 1088-1089.)

The court did not abuse its discretion in finding that grandmother failed to meet her burden of proving changed circumstances or that placement of T.B. with her would be in the child's best interests. Indeed, grandmother does not assert otherwise. Instead, she claims the court "construed" her section 388 petition "as a section 361.3 relative request for placement." Although the court addressed that request, it did not relieve grandmother of her burden of proof under section 388.

Moreover, grandmother's arguments regarding her rights to preferential placement consideration under section 361.3 are unavailing. That statute provides that relatives of a child removed from the physical custody of his or her parents pursuant to section 361 who request that the child be placed with them are given preferential consideration. (§ 361.3, subd. (a).) In determining whether such a placement is appropriate, the social worker and court shall consider numerous factors, including and most importantly the best interests of the child. (*Ibid.*) The statute does not mean, however, that placement with a relative must be preferred over a non-relative placement. Rather, the relative is only entitled to preferential consideration for placement. Our Supreme Court has stated that "the court is not to presume that a child should be placed with a relative, but is to determine whether such a placement is *appropriate*, taking into account the suitability of the relative's home and the best interest of the child. [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 321.)

10

Here, the record demonstrates that DSS considered grandmother as a possible relative placement for T.B., but were unable to approve that placement due to her prior DUI conviction and the evidence that excessive alcohol continued to be consumed in her home. T.B. could not be placed in her home without a grant of a criminal records exemption (exemption) by the State Department of Social Services or its county designee (agency). (§ 361.4, subd. (d)(2).) Grandmother provided no basis for DSS or the court to conclude that such an exemption was warranted. Over the course of six pages of the reporter's transcript, the court complied with its duty to address the reasons why grandmother's relative placement request had been denied. Although the court took issue with certain aspects of DSS's handling of the case, it ultimately found the agency had complied with section 361.3 in denying grandmother's relative placement request, and that she had received proper notice of that decision. We review that ruling for an abuse of discretion (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 319-320.), and conclude there was no such abuse here.

Grandmother claims that DSS failed to comply with the notice and assessment procedures for a relative placement request as provided in sections 309, subdivision (e)(1), and section 361.3. As we have noted, the reasons for denying grandmother's placement request are clear from the evidence and discussion at the hearing and support the court's decision. Moreover, grandmother was present at all of the relevant hearings and had ample notice of DSS's placement decision. Because it is not reasonably probable that any failure to fully comply with the relevant notice and assessment requirements would have resulted in T.B.'s placement with grandmother, any such error was harmless. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1137, disapproved on another point in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)[5]

_____

[5] In light of our conclusion, we need not address DSS's contention that grandmother, who represented herself below in propria persona, forfeited her right to assert these claims on appeal by failing to raise them below.

Father contends the order terminating parental rights must be reversed because the juvenile court erred in determining the ICWA did not apply. We disagree.

The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions. (25 U.S.C. § 1901 et seq.) "The ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource. [Citation.]" (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) The juvenile court and social services agencies have a duty to inquire at the outset of the proceedings whether a child subject thereto is, or may be, an Indian child. (*Id.* at p. 470.)

The duty to provide notice under the ICWA arises when "the court knows or has reason to know that an Indian child is involved. . . ." (25 U.S.C. 1912(a).) An "Indian child" is one who is either a "member of an Indian tribe or . . . eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (*Id.* at § 1903(4).) "The notice[s] . . . must contain enough information to be meaningful. [Citation.] The notice must include: if known, (1) the Indian child's name, birthplace, and birthdate; (2) the name of the tribe in which the Indian child is enrolled or may be eligible for enrollment; (3) names and addresses of the child's parents, grandparents, great grandparents, and other identifying information; and (4) a copy of the dependency petition. [Citation.]" (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703.) "It is essential to provide the Indian tribe with all available information about the child's ancestors, especially the one with the alleged Indian heritage. [Citation.]" (*Ibid.*; *In re C.D.* (2003) 110 Cal.App.4th 214, 224-225.)

We review compliance with the ICWA under the harmless error standard. (*In re E.W.* (2009) 170 Cal.App.4th 396, 402-403.) Notice is sufficient if

12

there was substantial compliance with the applicable provisions of the ICWA. (*In re Christopher I.* (2003) 106 Cal.App.4th 533, 566.)

Father claims the notice should have included more specific information regarding the names, addresses, and birth dates of T.B.'s ancestors with possible Indian heritage. Father fails, however, to explain how including more information may have led the tribes to respond differently. "'[T]echnical compliance with the [ICWA's] notice requirements may not be required where there has been substantial compliance.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1531.) "The purpose of the ICWA notice provisions is to enable the tribe or the [Bureau of Indian Affairs] to investigate and determine whether the child is in fact an Indian child. [Citation.] Notice given under ICWA must therefore contain enough information to permit the tribe to conduct a meaningful review of its records to determine the child's eligibility for membership. [Citations.]" (*In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576.) The information provided here was sufficient for all of the tribes to make such a determination. Any alleged deficiency in failing to include more specific information was thus harmless. (*In re E.W.*, *supra*, 170 Cal.App.4th at pp. 402-403.)[6]

---

[6] Prior to oral argument, counsel for DSS informed us that "[u]pon further investigation, the Nez Perce tribe's tribal agent requested to review the notices and we are honoring that request. This request, in our opinion, necessitates a limited reversal for re-noticing purposes." A limited reversal is unnecessary. The juvenile court file, of which we take judicial notice, indicates that on October 29, 2015, the Nez Perce tribe sent a response to the second notice stating that "[i]n order to be enrolled in the Nez Perce tribe an individual must have at least ¼ Nez Perce blood. Therefore, based on the information provided, the above-named minor does not appear to be eligible for enrollment in the Nez Perce Tribe. Therefore the Nez Perce Tribe will not be intervening in this matter."

The orders terminating father's parental rights and denying grandmother's section 388 petition are affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:



GILBERT, P. J.



YEGAN, J.

Linda D. Hurst, Judge

Superior Court County of San Luis Obispo

_____

Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant T.B. Jr.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant L.S.

Rita L. Neal, County Counsel, Leslie H. Kraut, Deputy County Counsel, for Plaintiff and Respondent.