Filed 11/23/22 In re I.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.G., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E078453 |
| Plaintiffs and Respondents, | (Super.Ct.No. INJ2000291) |
| v. | OPINION |
| W.G. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Susanne S. Cho, Judge. Affirmed with directions.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

Defendants and appellants N.G. (Mother) and W.G. (Father; collectively, Parents) are the parents of I.G. (female born October 2018; Minor). Parents appeal from the juvenile court's termination of their parental rights under Welfare and Institutions Code[1] section 366.26. Parents contend that (1) the juvenile court erred in finding that the beneficial parental relationship exception did not apply; and (2) the errors by the juvenile court and the Riverside County Department of Public Social Services (the Department), in complying with the duty of initial inquiry under the Indian Child Welfare Act[2] (ICWA), are prejudicial. For the reasons set forth *post*, we find (1) that the juvenile court did not err in finding that the beneficial parental relationship exception did not apply; (2) that the court erred in finding that ICWA did not apply. Therefore, we conditionally affirm the judgment and remand with directions.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

**FACTUAL AND PROCEDURAL HISTORY**

On September 9, 2020, the Department filed a section 300 petition on behalf of 23-month old Minor, and her three half-siblings, E.G. (female born May 2007; Sibling1), Ro.G. (male born July 2009; Sibling2), and Ri.G. (female born April 2011; Sibling3).[3, 4]

In the detention report, the social worker reported that between June and August 2020, the Department received multiple referrals alleging general neglect of the Children involving domestic violence and sexual assault. Mother reported that she was a member of a cult and feared the Children would become victims of sexual assault by the cult or Siblings' father. In the June referral, "[i]t was reported [Mother] threatened to harm the children," emotionally abuses Siblings, has mental illnesses, "including Borderline Personality Disorder, Post Traumatic Stress Disorder, and depression," and "abuses Xanax, marijuana, and alcohol." In the August 2020 referral, a reporting party indicated that Sibling1 expressed concern Mother was neglecting Minor and was "noncompliant with her mental health medication and services," and that mother had "erratic behavior rendering her incapable of caring for [Minor]."

On June 18, 2020, the social worker interviewed Siblings' father. He confirmed that on June 12, 2020, he was granted full custody of Siblings and Mother was awarded visitation in a therapeutic setting. The day after he was granted custody, Mother

---

[3] Sibling1, Sibling2 and Sibling3 are collectively referred to as Siblings; Minor and Siblings are collectively referred to as the Children.)

[4] Siblings have a different father and are not parties to this appeal. Therefore, the facts pertaining to Siblings will be limited.

absconded with Siblings. They were returned to his care eight days later when law enforcement found Mother "hiding at Martha's Village." Siblings' father sought full custody because he had concerns regarding Mother's mental health, and abuse of prescription medications and alcohol. "He reported [Mother] has a history of psychiatric holds, suicidal ideation, and not providing care for the children."

When the social worker interviewed Sibling2, who was 11 years old at the time, he stated that Mother "screams to herself and talks to herself" and has psychiatric problems. He also told the social worker that Siblings watched Minor, fed her, played with her, and put her to bed.

Sibling3, who was nine years old at the time, stated that Siblings feed themselves, and have to take turns caring for Minor by changing her diaper, feeding her, and watching her nap, because Mother was "doing adult things." Sibling3 also stated that she heard Mother and her new boyfriend yell at each other when they fought.

Sibling1 told the social worker that she and the Siblings have a "rotation of dishes, cleaning the floors, cooking, cleaning, laundry, and helping with [Minor]." Siblings change Minor's diaper, feed her, and give her naps. Sibling1 recalled Mother intentionally burning herself on a stove and then telling Sibling3 to do the same. Sibling1 stated that Mother remained in her room, drank daily, and kept a box of wine in the bathroom.

On June 25, 2020, Mother told the social worker that she was unavailable to meet because she was "terrorized that someone was going to hurt her," and she was going to make a police report.

On June 26, 2020, the maternal grandmother (MGM) informed the social worker that Mother has "severe untreated mental health issues and she could tell that" Mother was manic during a telephone call she made to MGM the night prior. Moreover, this was the first time Mother called MGM in four years. MGM was very concerned for the safety of the Children.

In July 15 and 27, 2020, two different social workers contacted Mother. On July 15, Mother told one social worker that she was "no longer in the area as she was traveling across the country to ensure [Minor's] safety[,] and declined to give her location. Mother "became belligerent and angry" and ended the call. On July 27, when another social worker contacted Mother to schedule a meeting, she "immediately started yelling and using profanity," and declined to meet with the social worker and ended the call.

On August 3, 2020, Mother contacted the social worker and "was yelling and cursing. She continued to refuse to make herself available to the Department, but would permit a video chat. However, a male (believed to be [Mother's] boyfriend) quickly started speaking and stated that he refused to allow anyone from the Department to see [Minor]."

On September 4, 2020, the Department requested and obtained a protective custody warrant for Minor. Father had not made himself available to the Department for an interview.

On September 8, 2020, the Department interviewed MGM; she reported having no Indian ancestry. Moreover, MGM denied that Mother ever lived in "an Indian reservation/Rancheria/community, attended school or received services or benefits from a

5

tribe or services that are available to Indians or the Federal government, such as the Indian Health Service."

On September 10, 2020, Father appeared in court, Mother appeared via telephone, and the juvenile court appointed counsel for both of them. Due to Mother's disruptions and noncooperation during the hearing, the court was forced to terminate the call. The court issued a bench warrant for Mother and a protective custody warrant for Minor as she was in Mother's custody.

Father filed an ICWA-020 Parental Notification of Indian Status form where he checked the box that he had "no Indian ancestry as far as I know."

The juvenile court found that ICWA did not apply to these proceedings and that the Department had conducted a sufficient inquiry in this case. The court then found Father to be the presumed father of Minor.

The juvenile court detained Minor from Mother and ordered no visitation for Mother based on her comments in court, records, and the family law case. The court stated that it had "extreme concerns regarding the harm Mother [has caused] the Minors." The court noted that when Minor is located, the Department should set up reasonable visitation between Father and Minor. The court set a jurisdictional hearing.

On September 28, 2020, the Department received information that Mother and Minor traveled to Washington but were "hitching a ride" with a truck driver. The Department contacted law enforcement and the child welfare agency in Washington to report Mother's abduction of Minor and to request assistance. On October 1, 2020, the Washington authorities took Minor into protective custody and the next day, the

6

Department picked up Minor and placed her with MGM. Mother reported that she tried to cooperate with the Department and was unaware of a warrant issued for Minor. She denied the necessity of removing Minor from her care, became angry at the social worker, and ended the call.

On October 6, 2020, Parents attended the jurisdictional hearing. The Department requested a continuance to complete its interviews and Father requested a contested hearing. Mother's counsel stated that Mother was amendable to psychological evaluations. The court appointed Dr. Suiter to evaluate Mother. The court ordered Mother's visitation to be supervised, twice a week. Father's visitation was set at twice weekly for one hour.

In a report filed on November 3, 2020, Dr. Suiter stated that he had difficulty obtaining information from Mother. Moreover, Mother's answers were vague. Moreover, Mother complained that the doctor had "threatened" her. Dr. Suiter suspended the psychological evaluation due to Mother's allegation.

The Department recommended the matter be continued in order to complete a psychological evaluation and for the court to order Mother to complete a second evaluation. Minor remained placed with MGM and Siblings.

On October 26, 2020, Sibling1 told the social worker that Mother had a good relationship with Father for about two years. After that, Sibling1 witnessed Father punch walls and throw things, have "mental breakdowns," and go into a rehabilitation program. In May of 2019, Father left the home after an altercation with Mother.

7

Sibling1 reported that Mother's behavior got much worse in March of 2020. Mother consistently made up stories and manipulated situations. Mother became mad at Sibling1 for no reason. Sibling1 kept Minor's crib in her room to keep Minor away from Mother and to keep Minor safe. Mother called herself a "witch" and wrote numbers and symbols on a white board. Siblings2 and 3 were afraid of Mother but would never say it out loud. After learning that Sibling2 told the Department about Mother's marijuana use, Mother locked Sibling2 in the bathroom, and told Sibling2 that he could not be with the family. Sibling1 went on to state that Mother's mood constantly changed. She stayed awake all night crying or drunk. Mother also smoked marijuana 10 times a day at a minimum, inside and outside the home. Sibling1 further stated that Mother spent hours locked in the bathroom, where Mother kept her drug paraphernalia and marijuana. Sibling1 cooked and cared for her younger siblings.

On November 5, 2020, Sibling2 hesitated when answering questions from the social worker. He reported that Mother had trouble sleeping but never talked to herself or screamed at night. Moreover, Sibling2 denied that Mother engaged in fights or arguments, or that he felt unsafe or scared. He stated that he felt bad that Mother had to deal with "legal stuff."

On the same day, Sibling3 told the social worker that Mother talked in her sleep, sleepwalked, and screamed at night. Mother stayed in bed all day, so the Siblings took turns caring for Minor. In February of 2020, Mother accused Sibling1 of threatening to drown Minor and shouted random things. Sibling3 witnessed Mother engage in fights with Father and others.

On October 29, 2020, Mother told the social worker that she engaged in self-harm by burning herself because she was raped by Siblings' father and others. In 2013, Mother was placed on a psychiatric hold for burning herself. Mother stated that MGM sexually molested her as a child. Moreover, Mother denied that she was crazy or that she harmed herself in front of the Children. Mother was working on getting back on track with therapy. Mother stated that she has Post Traumatic Stress Disorder (PTSD). Moreover, she stated that Father continued to be " 'sick' and 'mentally unstable' " and that he was incapable of caring for Minor.

Mother stated that Sibling1 took it upon herself to care for Minor. Mother was afraid for her children's safety because "the 'cult' (Jehovah Witness) condones rape, incest, and child abuse." Mother denied smoking marijuana in front of the Children. She also told the social worker that when Minor was six months old, Father left and "signed away his parental rights."

On November 9, 2020, Father told the social worker that Mother suffers from PTSD. Father agreed to allow Mother to stay with him from October 4 to 6, 2020, because Mother contacted him hysterically and stated, " 'I want to see you. I need you.' " During this time, Mother "seduced him," smoked marijuana, and drank alcohol. Moreover, Father stated that Mother was physically abusive during their relationship. He informed the social worker that Sibling1 took care of Minor because Mother rarely took care of Minor. Mother drank alcohol daily and needed someone to care for her. Father stated he left Mother when Minor was six months old.

After Father left, Mother made is impossible for Father to stay in touch with Minor. He stated that Mother "forced him to sign over his parents' rights" for Minor. He assumed Minor was doing well in Mother's care.

Father told the social worker that he was borderline suicidal when he lost Minor and entered a treatment program. He first tried alcohol at the age of 10. He drank excessively and smoked marijuana in high school to escape his home life. Father also experimented with cocaine and continued to drink in college to cope with his problems. Father stated that he was one and one-half years sober from alcohol. He wanted custody of Minor because he has the means to support and care for her, and he was an experienced father because he raised two other children. Father's relationship with his older children was tarnished due to his relationship with Mother.

When the Department interviewed Mother on October 29, 2020, and Father on November 9, 2020, both Mother and Father denied having any Indian ancestry.

In the report, the Department recommended that the juvenile court find the allegations true. On November 16, 2020, the Department filed a first-amended section 300 petition, striking the allegation that Father's whereabouts are unknown.

On November 19, 2020, at the contested jurisdictional hearing, Parents were present. The court continued the hearing for Mother to complete her psychological evaluation with Dr. Jones. The court also ordered Father to complete a psychological evaluation with Dr. Suiter. The court admonished Mother to be appropriate during her supervised visitations and stated, if "the mother continues to make inappropriate

comments or tries to violate the safety boundaries that are in place, Court authorizes the Department to suspend visitation for mother."

On December 21, 2020, Dr. Jones filed Mother's psychological evaluation report. Dr. Jones recommended that Mother receive a psychiatric evaluation regarding possible uses of psychotropic medications, and receive treatment on a long-term basis by a therapist experienced in treating PTSD. Dr. Jones recommended that Mother abstain from marijuana, alcohol, and other intoxicating drugs. He also stated that Mother likely needed to participate in a substance abuse treatment program with extended aftercare. Dr. Jones then concluded that "[g]iven [Mother]'s emotional l[i]ability, her intense anxiety, depression, and other symptoms of PTSD, as well as her reportedly absconding with [Minor] to Washington, she is not likely to be able to resume caring for her children until her emotional distress improves and her condition stabilizes."

In the interim, Father attended supervised visits and his interactions with Minor were positive. Minor was receptive and played with Father.

From October 6, 2020, to November 19, 2020, Mother had supervised visits with the Children, including Minor. Mother was affectionate and mostly paid attention to Minor. Mother, however, discussed the case with Sibling1. Therefore, Mother had to be redirected several times. Mother had difficulty staying focused. She also had power struggles with Sibling1 when disciplining Minor when she misbehaved. Minor sought Sibling1 for comfort.

On November 25, 2020, Mother's visit was going well until the last five minutes; Mother learned that Minor referred to Father as "dad." Mother became upset and was

11

unable to control her emotions. She began to shout and scatter her belongings. Mother told Siblings to remind Minor about her "real" father, Mother's husband.

During a Zoom visit in December 2020, Mother invited her husband to participate. Although the supervising personnel from the Department reminded Mother that her husband could not participate in the zoom visit, he continued to appear in the call even after knowing he could not participate. Moreover, Mother had to be redirected when she improperly discussed the case in subsequent visits.

In November 2020, the Department provided Parents with referrals to services. On December 21, 2020, Mother tested positive for marijuana and negative for other substances. On December 29, 2020, the Department referred Mother and Father to Dr. Garett for a psychological evaluation.

On January 5, 2021, Dr. Garett filed a psychological evaluation report. Dr. Garett diagnosed Mother with bipolar disorder, PTSD, generalized anxiety disorder, aspects of a narcissistic personality type with paranoid features, fibromyalgia, and chronic pain due to endometriosis and claimed physical abuse. The doctor concluded that Mother seemed to use a varied number of medications, both prescription and otherwise, to address her medical issues. Dr. Garett stated that Mother's problems are "fairly severe" and chronic, and require a highly trained individual to treat her. He stated that Mother's mental health issues need to be addressed fully and completely in order for her to function as an effective parent.

On January 12, 2021, the juvenile court continued the contested hearing again for Father's psychological evaluation report to be reviewed by the parties. The court ordered

Mother that she could not mention her new husband as being the father of Minor. If Mother was inappropriate in her visits, the court ordered the Department to terminate the visits.

On the same day, Dr. Garett filed a psychological evaluation of Father. Dr. Garett diagnosed Father with severe alcohol use disorder in sustained recovery as Father claimed, and an unspecified personality disorder, turbulent type with histrionic features. The doctor recommended that Father attend psychotherapy for at least six months, and increase visits based on his progress in services and continued sobriety.

As to disposition, the Department recommended reunification services to Father and that Mother be denied services based on section 361.5, subdivision (b)(2). Father's case plan services included anger management, counseling, parenting education, psychotropic medication evaluation, and substance abuse services.

Mother continued to attend her supervised visits. She was appropriate but had to be redirected at times.

In February 2021, MGM told the Department that she received text messages from Mother accusing MGM of "trying to hurt [Mother]" and begging to see Minor. Mother appeared delusional and unaware of what was happening.

On February 17, 2021, Mother attended a supervised visit with all her children. The Department terminated the visit early because of Mother's repeated attempts to show Sibling3 a text message.

13

Father attended supervised visits and was attentive to Minor. He expressed concern with MGM caring for Minor. Father stated that he agreed with Mother to put up a "united front." He stated Mother is a "good mom" and he had no concerns about her.

On February 11, 2021, and February 25, 2021, Father cancelled his visits with Minor.

On March 5, 2021, the juvenile court received a copies of an email and letter Father wrote.

In the email dated February 24, 2021, Father wrote: "I am writing this letter of my own free will and of sound mind and body. I feel that it is in [Minor's] best interests to have [Mother's husband] be her leagal [*sic*] father and all the rights that come with that. He has been her father since the age of 6 months. I know he has her best interests in mind and will take good care of her. I have struggled with my mental health for years and drug addiction. This is all for the best interests of [Minor]."

In the letter dated almost two years prior, May 18, 2019, Father admitted that he had either threatened Mother or had physically injured her during his psychotic episodes. He wrote about those events with specificity. With this letter, Father attached a form, which was fully executed and notarized, consenting to a stepparent adoption of Minor by Mother's husband.

On March 5, 2021, the Department field a second amended section 300 petition, adding an allegation under section 300, subdivision (b), that Father had a history of abusing alcohol which placed Minor at risk of physical harm or neglect.

14

On March 22, 2021, Mother stated that Father broke into her house, threatened her, and "got himself 5150." During this time, Mother visited with the children without concern.

On March 30, 2021, Mother's husband told the social worker that he never adopted Minor and he never filed the adoption documents. He was aware of Mother's mental instability and tried to help her. The husband was interested in raising Minor.

Although the Department attempted to contact Father to schedule visits, Father was unavailable in March 2021. On March 31, Father told the social worker that he entered treatment on March 23, 2021, after he relapsed on alcohol and had suicidal thoughts. He stated that he continued to be codependent on Mother. Mother told Father's employer about his relapse and he was fired. Father reported that Mother and her husband were living in "deplorable conditions" and drank alcohol daily. He said neither of them were able to care for Minor.

On April 26, 2021, the juvenile court denied a request to designate Mother's husband as Minor's presumed father. Father remained Minor's only presumed father.

On April 26, 2021, the Department filed a third amended petition. This petition added two allegations under section 300, subdivision (b), alleging that Father has a history of abusing alcohol and that he suffers from mental health issues.

At the contested jurisdiction/disposition hearing on April 26, 2021, the juvenile court found the allegations in the petition to be true by a preponderance of the evidence. The court adjudged Minor as a dependent of the court, and removed physical custody of Minor from Parents. The court found Father is a noncustodial parent and it was

detrimental to place Minor with him. The court then denied reunification services to both Mother and Father. The court denied reunification services to Mother under section 361.5, subdivision (b)(2). The court reduced Parents' visitation. For Mother, visitation was set for one time a month for one hour. For Father, visitation was set for two times a month for two hours. The court also found that ICWA did not apply. The court set a section 366.26 hearing.

On August 13, 3021, Father filed a section 388 petition requesting family reunification services and weekly visitations with Minor. Father stated that he had completed his inpatient treatment program, was in therapy, and was in sober living. He stated that he had not missed a visit and all visits were going well. The court set the petition for hearing.

In the Department's section 366.26 report filed on August 16, 2021, the social worker recommended that the court terminate parental rights of Parents and free Minor for adoption by MGM.

In the report, the social worker noted that Father denied any Native American ancestry or tribal affiliation on July 28, 2021. MGM also denied any Native American ancestry or tribal affiliation on June 9, 2021.

The social worker reported that Minor was physically healthy, and an active two year old. She was meeting all her developmental milestones. She also liked swimming, building things, and playing with dolls and cars. She was reported to have a healthy appetite. Minor had advanced verbal skills, and was able to express her needs. The social worker reported that MGM was attentive and nurturing with Minor, and met

16

Minor's emotional and medical needs. Minor adjusted well to MGM's home. MGM continued to express that she was able and willing to provide permanency for Minor via adoption. Minor and MGM have formed a strong relationship and were bonded with each other.

Parents continued their visits with Minor. They were both appropriate.

In the preliminary adopt assessment report, the Department stated that Minor sought out MGM to have her needs met, and was comfortable and happy in the home. Minor was also bonded with Sibling1 who also resided in the home. She is reported to be eating and sleeping well. Moreover, MGM is committed to parenting Minor for a lifetime. The Department determined that Minor was adoptable and recommended that MGM be allowed to adopt her.

On August 23, 2021, Mother filed a section 388 petition seeking reunification services. She claimed that Minor was bonded with her and would benefit from continuing their relationship. Mother stated that she had been attending weekly psychotherapy sessions since March 2020. Her therapist stated that Mother was "eager to get better, but lives in constant fear and anxiety that she is being tormented by her ex-husband and that she is going to lose her children at any moment." The therapist also stated that this case was causing Mother to become "more and more emotionally dysregulated, anxious, and depressed." The therapist opined that Mother was an excellent mother and competent to raise her children. The therapist then stated that returning Children to Mother would allow her to "resume the work we set out to do

which is processing her traumatic childhood memories so that she can feel safe." The court set the petition for hearing.

On August 26, 2021, Minor's counsel set the sections 366.26, 388, and 366.3 hearings for contest. At the hearing, Mother's counsel informed the court that "mother is asking to have an ICWA 020 filed at this time. . . . [¶] There may be American Indian heritage. And I understand that the Department will need to investigate that. [¶] I'd just ask the Court for permission to file the ICWA 020 today." The juvenile court granted permission to file the ICWA 020.

On the same day, Mother filed an ICWA-020 Parental Notification of Indian Status form. In the form, Mother stated that she is or may be a member of, or eligible for membership in a federally recognized Indian tribe, and listed the tribes as "Blackfoot, Cherokee."

On September 21, 2021, the Department filed its response to the JV-180 request to change a court order. In its response, the Department recommended that the court deny both the section 388 petitions filed my Mother and Father. The Department also noted that Father was terminated from his outpatient program in August 2021. He visited Minor and the visits went well.

The Department reported that Mother claimed to be participating in various treatments. Mother, however, was unable to provide proof of her current participation. Mother later filed proof of completing two parenting education programs. Mother attended her monthly visits without concern. Father continued to have contact with Mother.

18

On September 23, 2021, the Department filed a copy of its inquiry letter sent separately to the Blackfeet tribe, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians. In the letter, the Department requested that the tribes inform the Department if Minor's family members are enrolled or eligible for enrollment with their tribe, and to indicate if any additional information was needed to make the determination.

On September 27, 2021, the juvenile court continued the section 366.26, and denied Parents' section 388 petitions.

As to Father's petition, the court found that Father's downfall has been his relationship and involvement with Mother, and that Mother triggered his relapse. Moreover, the court found that Parents are still enmeshed with each other. Mother and Father have had contact despite a current criminal protective order in place, which did not allow Father to have contact with Mother. Although the court recognized that Father loves Minor, it found that reunification was not in Minor's best interest—based on Minor's age and Father's continued issues in the case. Therefore, the court denied Father's petition "because it's changing circumstances, not in the best interest."

As to Mother's petition, the juvenile court also denied the petition "for the same reasons; mother's more so than, obviously, father. . . . [¶] Mother has, hopefully, and continues to do her psychotherapy and other issues to address her mental health."

Thereafter, the juvenile court continued biweekly visits for Father with Minor. The court also found that it was not in Minor's best interest "to expose her to the issues of the Parents and there are no changing circumstances."

19

The Department filed tribal response letters from (1) the Eastern Band of Cherokee Indians on October 21, 2021; and (2) the United Keetoowah Band of Cherokee Indians on December 1, 2021, indicating that Minor was neither registered nor eligible to register as a member of their respective tribes. Therefore, in its addendum report filed on December 6, 2021, the Department stated that ICWA did not apply to this case.

In the addendum report, the social worker reported that Father continued to visit Minor twice a month for one hour. During their visits, Minor had fun and played with MGM's toys. Minor engaged in some conversation with Father but eventually ran out of things to say and indicated she wanted to go home by the middle of the visit. The social worker stated that the interaction between Minor and Father "[was] good when they [saw] each other, but there [did] not seem to be emotional attachment, as [Minor] always [wanted] to end the visit early, [did] not cry when the visit [ended], and according to the caregiver, [Minor] [had] expressed that she [did] not want to have a visit with her father." Minor also expressed to the social worker that she did not want to go on visits with Father.

The report also stated that Mother continued her visits with Minor once a month for an hour. Minor recognized Mother and the interactions were appropriate. However, the social worker noted that "there does not seem to be an emotional attachment between them. [Minor] is always happy to leave the visits, and go see [MGM]. [Minor] does not cry or ask to stay longer when it is time to leave." Moreover, all visits between Mother and Minor have been supervised in the Department's office. The social worker

20

concluded, "it is difficult to form an emotional attachment with a one hour visit, once a month."

On January 14, 2022, Mother's counsel argued that the beneficial parental relationship exception applied and that Mother's parental rights should not be terminated. Father's counsel also argued that the beneficial parental relationship exception to termination of parental rights applied to Father. Minor's counsel submitted on the Department's recommendation to terminate parental rights. After making some arguments about the relationship between Minor and Parents, counsel stated: "So [Minor's] actually not benefitting from any relationship or continued visits with the mother or the father in this matter. And I'm not going to rehash the history of the case regarding father's in-and-out involvement and thought process. [¶] You know, clearly, he and the mother are still in a relationship together. It's just not in the best interest of this child to proceed by anything other than termination of parental rights and adoption. She's thriving. She needs the stability that she's finally gotten, and so I would ask the Court to follow the Department's recommendation."

County counsel argued that Minor did not have a positive emotional attachment to Parents, and termination of parental rights would not be detrimental to Minor's well-being.

The juvenile court found that the beneficial parental relationship exception did not apply to either parent. The court also found that Minor was doing well out of Parents' custody, and Parents did not add much to Minor's emotional and mental well-being, and there were "some indications actually it's detrimental." Therefore, the court terminated

21

parental rights and found that none of the exceptions contained in section 366.26, subdivision (c)(1)(A) and (B) applied to this case.

On February 28, 2022, the court found that ICWA did not apply to this case.

On January 31, 2022, Father filed a notice of appeal from the court's orders at the section 366.26 hearing; Mother did not file a notice of appeal. On March 7, 2022, Mother filed a notice of appeal.

## DISCUSSION

### A. THE BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION

Both Mother and Father contend that the juvenile court failed to engage in a proper analysis under *In re Caden C.* (2021) 11 Cal.4th *614* (*Caden C.*) when determining whether the beneficial parental relationship exception did not apply to Parents. For the reasons set forth *post*, we find the juvenile court properly found that the beneficial parental relationship exception to adoption did not apply to this case.

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the child. If a child cannot be returned to his or her parents and is likely to be adopted if parental rights are terminated, a court must select adoption as the permanent plan unless one of the exceptions provided in section 366.26, subdivision (c) applies. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 946; *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

In order to invoke an exception under section 366.26, subdivision (c)(1)(B)(i), "the moving parent must establish, by a preponderance of the evidence, each of the following elements: (1) that the parent has regularly visited with the child; (2) that the child would benefit from continuing the relationship; and (3) that terminating the relationship would

22

be detrimental to the child." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).) This exception "to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

We review the juvenile court's findings on the first two elements under the substantial standard of review. (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 206 (*L.A.-O.*).) "But 'the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion.' " (*Id.*, at p. 206, quoting *Caden C.*, *supra*, 11 Cal.App.5th at p. 639.) " 'A court abuses its discretion only when " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " ' " (*L.A.-O.*, at pp. 206-207, quoting *Caden C.*, at p. 641.)

In this case, the juvenile court analyzed the beneficial parental relationship exception under *Caden C.*, *supra*, 11 Cal.5th 614. After counsel for Mother then counsel for Father made their arguments, Minor's counsel stated: "So it appears that both Mother and Father's counsel are trying to claim that the beneficial relationship exception applies to the two-six hearing. I would respectfully disagree with that." Counsel went on to state that the beneficial parental relationship exception is not an issue and cited to *Caden C.*, stating: "*In Re Caden C.* discusses the fact that whether the parents are engaged in or have benefited from services is not be considered at the two-six hearing. For the exception to be considered, it is whether or not there is a demonstrated beneficial relationship between the parent and the child." Minor's counsel then went on to

summarize the visits and the relationship Minor shared with Parents. Counsel concluded that Minor was now thriving and "needs the stability that she's finally gotten" and it was in the best interest of Minor to terminate parental rights in this case.

County counsel concurred with Minor's counsel and also cited to "the *Caden C.* case and some series of cases that have come from that." County counsel went on to discuss the beneficial parental relationship exception requirements and stated that "the parents need to show—the notice is on them—that there's not just familiarity and recognition but a positive emotional attachment between the parents and child. And, Your Honor, that's where I would submit to the Court that the facts do not exist even by a preponderance. Familiarity alone and having fun at their monthly engagements isn't in and of itself enough to show a positive emotional attachment, such that it would be detrimental to [Minor] if the Court were to terminate parental rights. And that's the analysis that the Court knows—that the Court performs on a case specific study to determine whether the benefit of the adoptive home outweighs the detriment that the child would suffer from losing a positive emotional attachment."

The juvenile court noted that "[t]he only issue before this court on a selection and implemental hearing is basically whether this court should terminate parental rights, and is there any exception to it. The exception cited . . . is the beneficial parent-child relationship exception. [¶] The Supreme Court when it issued the case applying that exception usually applies to situations where the children are older. They have a very strong relationship with their parents. They want to continue to have that relationship with their parent. They see that parent as their mother and father. And the child is

24

benefitting from having that relationship. And so the Court wanted judges to be careful about terminating parental rights in that scenario."

The court then stated, "[s]o in terms of the legal standards in this case, this is not a case where the beneficial exception would help the parents that much unfortunately. I recognize they love their child. Who wouldn't? It's their child. And so never a good day in court when the Court is asked to terminate parental rights to look for a permanent plan for the child. And I recognize that it's extremely difficult for the parents, especially the mother who is having a hard time. But the legal structure as stated requires me to look at the long-term plan for this child and what would be appropriate given the entire circumstances of this child's life up to today's hearing and the parents' involvement in the case." The court thereafter terminated the parental rights of Parents.

We agree with the juvenile court's reasoning and findings. Even if we could find that there was some benefit to maintaining the relationship between Parents and Minor, we find that there would be no detriment to Minor with the termination of her relationship with Parents. This court recently explained that " 'in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]' [Citation.] The court must ask, 'does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" ' " (*L.A.-O.*, *supra*, 73 Cal.App.5th at p. 206.)

Here, the juvenile court did just that. There is no evidence that severing the relationship between Parents and Minor would be detrimental to Minor. Minor has been removed from Mother's care for over two years, and Minor never resided with Father. Both Mother and Father visited with Minor, as permitted, and the visits went well. Parents, therefore, contend that there was evidence of a significant parent-child relationship despite the lack of daily contact and Minor's positive bond with MGM.

" 'Yet the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with [their] natural parent. (*In re Dakota H.*[ (2005)] 132 Cal.App.4th [212,] 229 [a parent must demonstrate something 'more than frequent and loving contact, an emotional bond with the child, or pleasant visits']; *In re Angel B. (*2002) 08 Cal.App.4th 454, 458 ['for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt'].)" (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 316.)

Here, neither Parent has been able to show that their relationship with Minor was compelling enough to forego adoption. Instead, the evidence showed that although the visits went well and were regular, the visits were always supervised and never progressed to unsupervised, overnight or weekend visits. Moreover, although Parents may have been upset after visits with Minor because they had to leave her, the social worker noted that Minor did well when the visits ended, and there was nothing evidencing that Minor was upset after visits or asked to visit with either parent at other times. In fact, the social worker noted that Minor was "always happy to leave the visits. . . . She does not cry or

26

ask to stay longer when it is time to leave." Moreover, according to the Department's reports, which were adopted by the juvenile court, Minor often wanted to go home in the middle of the visits with Father. And, moreover, Minor indicated that she did not want to go on visits. The social worker took note of the interactions between Minor and Parents and noted that Minor did not appear to have an emotional attachment with Parents. Furthermore, Minor was not only bonded with MGM, but also with Sibling1 who resided there as well.

Again, we note that Minor was only three years old at the time of the section 366.26 hearing. Minor was neglected by Mother and Father and raised by her older siblings, as noted in detail *ante*. Father left Minor when she was only six months old, authorized Mother's husband to adopt Minor, and did not return until this case commenced. With these facts in mind, although the court noted Parents' appropriate supervised visits with Minor, the court gave significant weight to the more recent observation at visits of Minor's behaviors and feelings toward Parents.

Based upon the observations of Minor's relationship with Parents from numerous recent visits between them, the trial court referenced and placed weight on the absence of Minor's positive emotional attachments with Parents.

Assuming *arguendo* that Minor would benefit from continuing her relationship with Parents, the beneficial parental relationship exception would not apply to this case because there is more than substantial evidence to show that terminating the relationship would not be detrimental to Minor. To determine whether termination would be detrimental, the court must decide whether it would be harmful to the child to sever the

27

relationship wand choose adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Here, there was no evidence that Minor would be harmed.

Here, the juvenile court found that Minor was doing well in in MGM's home wherein Siblings also resided. The social worker observed that Minor was bonded not only with MGM, but also with her sisters who essentially cared for her while they resided with Mother since Minor was an infant. Neither Parent offered ay evidence that would show Minor would suffer any detriment. As provided in detail *ante*, Minor was happy and comfortable with MGM and sought her out to find comfort and to have her needs met. Minor had been placed with MGM since October 2020, when Minor was only two years old. Although the evidence showed that Minor had a strong emotional bond with MGM, there was nothing in the record to indicate that Minor had an emotional attachment to either parent. Again, Minor was happy when the visits ended, never asked about seeing either Mother or Father between visits, and often did not want to go on visits with Father.

Indeed, Parents have failed to present evidence that their relationship with Minor was more than an "incidental benefit" from positive interactions with Mother and Father during visitations, particularly when weighed against the benefit of a permanent home. The exception requires the existence " ' "of a substantial, positive emotional attachment" ' between parent and child." (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 319.) There was no evidence that Minor had a substantial, positive emotional attachment to either Father or Mother.

Hence, there is no evidence that Minor would be "greatly harmed" by the termination of their natural parent-child relationship with Mother and Father. (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.) Therefore, we conclude Parents have failed to show that the juvenile court's findings lack the support of substantial evidence or that its exercise of discretion rested on an unsupported factual basis. In short, the court properly found the beneficial parental relationship exception to adoption did not apply.

### B. INITIAL INQUIRY REQUIREMENTS UNDER ICWA

Parents argue that the Department failed to ensure proper compliance under ICWA. Father contends that the Department failed to inquire of known maternal relatives about possible Indian heritage and Mother contends that the Department failed to contact "readily available" relatives about possible Indian ancestry. We agree with Parents.

ICWA, enacted in 1978, is a federal law, which is recognized and applied in California. (See, e.g., *In re Alice M.* (2008) 161 Cal.App.4th 1189, 1197.) Its purpose is to protect the interests of Indian children and to promote the stability and security of Indian tribes and families. (25 U.S.C. § 1902; see, e.g., *In re Elizabeth W.* (2004) 120 Cal.App.4th 900, 906.) The law was adopted "in response to concerns ' "over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." ' [Citations.] [The] ICWA addresses these concerns by establishing 'minimum Federal standards for the removal of Indian children from their families and the

29

placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.' " (*In re Abbigail A.* (2016) 1 Cal.5th 83, 90.)

"In 2006, California adopted various procedural and substantive provisions of ICWA.  [Citation.]  In 2016, new federal regulations were adopted concerning ICWA compliance.  [Citation.]  Following the enactment of the federal regulations, California made conforming amendments to its statutes, including portions of the Welfare and Institutions Code related to ICWA notice and inquiry requirements.  [Citations.]  Those changes became effective January 1, 2019 . . . , and govern here." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048, fn. omitted (*D.S.*).)  The new statute defines the actions necessary to determine a child's possible status as an Indian child.

ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); accord, § 225.1, subd. (a) [adopting the federal standard].)  "Being an 'Indian child' is thus not necessarily determined by the child's race, ancestry, or 'blood quantum,' but depends rather 'on the child's political affiliation with a federally recognized Indian Tribe.' " (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882.)

"ICWA itself does not impose a duty on courts or child welfare agencies to inquire as to whether a child in a dependency proceeding is an Indian child. [Citation.] Federal regulations implementing ICWA, however, require that state courts 'ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the

30

participant knows or has reason to know that the child is an Indian child.' [Citation.] The court must also 'instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.' " (*In re Austin J.*, *supra*, 47 Cal.App.5th at pp. 882-883.)

Since states may provide "a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided" (25 U.S.C. § 1921), under California law, the court and the county welfare department have an "affirmative and continuing duty to inquire" whether a child in dependency proceedings "is or may be an Indian child." (§ 224.2, subd. (a) [the duty to inquire whether a child is or may be an Indian child begins with the initial contact]; Cal. Rules of Court, rule 5.481(a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 14.)

Initially, the county welfare department must ask the "child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) At the parties' first appearance before the juvenile court, the court must ask "each participant present in the hearing whether the participant knows or has *reason to know* that the child is an Indian child" (§ 224.2, subd. (c), italics added), and "[o]rder the parent . . . to complete *Parental Notification of Indian Status* ([Cal. Judicial Council] form ICWA-020)." (Cal. Rules of Court, rule 5.481(a)(2)(C).)

When there exists a *reason to believe* that an Indian child is involved, the social worker must "make further inquiry regarding the possible Indian status of the child." (§ 224.2, subd. (e).)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1051.)

In this case, Parents challenge the failure of the Department to comply with ICWA's initial inquiry requirements. Parents contend that the Department failed to sufficiently comply with its duty of initial inquiry because the social workers failed to interview extended family members about possible Indian heritage, as required under section 224.2, subdivision (b). We agree with Parents. There is no evidence to indicate that the Department made any inquiries of either the maternal or paternal relatives about their Indian ancestry, except for MGM.

Under ICWA, the parents and siblings of Parents are among those " 'extended family members' " the Department must interview, if possible, to help determine whether the proceeding involves an Indian child. (See Cal. Rules of Court, rule 5.481(a)(4)(A); 25 U.S.C. § 1903(2) [defines " 'extended family member' " to include "the Indian child's grandparent, aunt or uncle"].) The Department must make a good faith attempt to locate and interview extended family members who can reasonably be expected to have information concerning a child's membership status or eligibility. (*D.S.*, *supra*, 46 Cal.App.5th at pp. 1052-1053; see *In re Breanna S.* (2017) 8 Cal.App.5th 636, 652.)

32

However, the Department "is not required to 'cast about' for information or pursue unproductive investigative leads." (*D.S.*, at p. 1053.)

In this case, although the Department interviewed Parents and MGM, there is nothing in the record to indicate that the Department interviewed Minor's other grandparents, aunts, or uncles about their Indian ancestry. (*In re K.R.* (2018) 20 Cal.App.5th 701, 709-710 [agency cannot rely on absence of documentation to argue that appellant's claim of ICWA error must fail on appeal].) The social services agency is obligated "to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status." (*Id.* at p. 709.) Moreover, the juvenile court "has a responsibility to ascertain that the agency has conducted an adequate investigation and cannot simply sign off on the notices as legally adequate without doing so." (*Ibid.*)

Here, as noted *ante*, the Department asked MGM about possible Indian ancestry for Minor. However, the Department did not note if it made any attempts to contact other relatives—parents, siblings, aunts, uncles—of either parent to inquire about possible Indian ancestry. Although these relatives did not attend any hearings, their names were noted in the record. All the Department had to do was show that it made "a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status." (*In re K.R.*, *supra*, 20 Cal.App.5th at p. 709.) There is nothing in the record noting this, or any, effort.

Therefore, because the Department failed to document the inquiry efforts required under section 224.2, there is insufficient evidence to support the court's determination

that ICWA did not apply to the case.  (See § 224.2, subds. (b), (c) & (e); accord, *In re Darian R.* (2022) 75 Cal.App.5th 502, 509.)

Nonetheless, when an appeal concerns "the *agency's* duty of initial inquiry, only state law is involved.  Where a violation is of only state law, we may not reverse unless we find that the error was prejudicial." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742.)  Currently, there is "a wide and varied split of authority among the [California] Court of Appeal regarding the proper standard to apply in determining the prejudicial effect of an agency's failure to comply with its section 224.2, subdivision (b) duty of initial inquiry [even within the same appellate court, like this court]." (*In re Y.M.* (2022) 82 Cal.App.5th 901, 911.)

Recently, in *In re Dezi C.* (2022) 79 Cal.App.5th 769 (*Dezi. C.*), our colleagues in the Second District, Division Two, explained the three different harmless error analysis rules, while creating a fourth "reason to believe" rule, as follows:  "At this point in time, the California courts have staked out three different rules for assessing whether a defective initial inquiry is harmless.  These rules exist along a 'continuum.'  [Citation] The rule at one end of this continuum is one that mandates reversal:  If the Department's initial inquiry is deficient, that defect necessarily infects the juvenile court's ICWA finding and reversal is automatic and required (the 'automatic reversal rule').  [Citations.] Under this test, reversal is required no matter how 'slim' the odds are that further inquiry on remand might lead to a different ICWA finding by the juvenile court.  [Citation.]  The rule at the other end of the continuum is one that presumptively favors affirmance. Hence, if the Department's initial inquiry is deficient, that defect will be treated as

harmless unless the parent comes forward with a proffer on appeal as to why further inquiry would lead to a different ICWA finding (the 'presumptive affirmance rule'). [Citations]  The third rule lies in between:  If the Department's initial inquiry is deficient, that defect is harmless unless 'the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child' and that 'the probability of obtaining meaningful information is reasonable' ('the readily obtainable information rule')."  (*Id.* at pp. 777-778.)

The *Dezi C.* court then went on to state that "despite this diversity of rules—and, indeed, perhaps because we have had the benefit of considering these rules—we propose a fourth rule for assessing harmlessness."  (*Dezi C.*, *supra*, 70 Cal.App.5th at p. 778.) The court stated: "In our view, an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding.  For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal. To illustrate, a reviewing court would have 'reason to believe' further inquiry might lead to a different result if the record indicates that someone reported possible American Indian heritage and the agency never followed up on that information; if the record indicates that the agency never inquired into one of the two parents' heritage at all [citation]; or if the record indicates that one or both of the parents is adopted and hence

their self-reporting of 'no heritage' may not be fully informed." (*Dezi C.*, *supra*, 70 Cal.App.5th at p. 779, fn. and italics omitted.)

On this appeal, although Parents accurately contend that the Department failed in its duty to interview Parents' extended relatives, we still must determine whether this error prejudiced Parents. Although we acknowledge the four diverse harmless error analysis rules, including three different rules from this court, we cannot say the error was harmless for several reasons. First, there was evidence in the record that the Department had the names of Parents' relatives. As such, the Department could have easily documented whether they tried to find them to interview them concerning Minor's Indian status. There is nothing in the record to show that the Department took the time to check whether these relatives could have been reached. In short, there is no good reason for why the Department did not make any effort to locate and interview the extended family members to obtain information about Minor's possible Indian status, as required under ICWA. Therefore, the Department's failure to make an effort to contact the known relatives in order to obtain the information was prejudicial.

Notwithstanding the above, the Department argues the error was not prejudicial because both parents unequivocally denied having any Indian ancestry on numerous occasions. However, section 224.2, subdivision (b), "requires the [d]epartment to ask, as part of its initial duty of inquiry, extended family members (including the biological grandparents) whether the child is or may be an Indian child . . . . [And n]othing . . . relieves the [d]epartment of its broad duty to seek that information . . . simply because a parent states on the ICWA-020 form . . . 'I have no Indian ancestry as far as I know.' "

(*In re Y.W.* (2021) 70 Cal.App.5th 542, 554.) "Such a rule ignores the reality that parents may not know their possible relationship with or connection to an Indian tribe." (*Ibid.*) Moreover, the Department's "position ignores the express obligation that section 224.2, subdivision (b), imposes on the [d]epartment to inquire of a child's extended family members—regardless of whether the parents deny Indian ancestry." (*In re Antonio R.*, 2022) 76 Cal.App.5th 421, 431.) And, as we explained in *Benjamin M.*, although we do not know what the extended family members will say in response to an inquiry by the Department, their answers are likely to bear meaningfully on the question of whether the Children are or may be Indian children. (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 744-745.)

Moreover, as provided *ante*, Mother later stated that she believed she had possible Indian heritage. The Department, however, contends that "mother's statement that she has Indian ancestry is not reliable, because the maternal grandmother repeatedly denied any Indian ancestry in her family." We agree that MGM denied having Indian heritage. However, there is nothing to indicate that the Department inquired with Mother's paternal relatives as required under ICWA.

Furthermore, we cannot reasonably infer that Parents inquired with their family members, other than MGM, about possible Indian heritage before denying Indian ancestry, as there is no evidence suggesting they did or did not. Absent some evidence suggesting Parents already asked their family members, or that the information the family members have is unlikely to meaningfully bear on the children's Indian status (one way or the other), the Department is obligated to speak to them precisely because we cannot

37

impute knowledge one family member has about their family to all family members. Moreover, it is not Parents' duty to ask their relatives for this information, it is the Department's. Without more, the Department cannot rely on Father's or MGM's denials assuming they did the work for it—it must perform the investigation itself.

For these reasons, "[w]here the Department fails to discharge its initial duty of inquiry under ICWA and related California law, and the juvenile court finds ICWA does not apply notwithstanding the lack of an adequate inquiry, the error is in most circumstances, as here, prejudicial and reversible." (*Antonio R.*, *supra*, 76 Cal.App.5th at p. 435.) Therefore, a conditional reversal is required under *Benjamin M.*, which is grounded in our state's constitutional rule for determining whether error is prejudicial and requires reversal. (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 742-744; Cal. Const., art. VI, § 13.) We note that, in this case, the Department sent notices to a couple of tribes per Mother's statement that she may have Indian heritage. These notices, however, do not impact the analysis of whether the Department complied with its *initial duty* under ICWA.

Accordingly, we conditionally affirm the order terminating parental rights to permit the Department to complete its initial inquiry under ICWA.

## DISPOSITION

The order terminating parental rights of Mother and Father to Minor is conditionally affirmed. The matter is remanded to the juvenile court with directions to comply with the initial inquiry provisions of ICWA and Welfare and Institutions Code sections 224.2 and 224.3 (and, if applicable, the notice provisions as well), consistent

38

with this opinion.  If, after completing the initial inquiry, neither Department nor the court has reason to believe or reason to know that Minor is an Indian child, the order terminating parental rights will remain in effect. If the Department or the court has reason to believe that Minor is an Indian child, the court shall proceed accordingly.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.


We concur:


SLOUGH
J.


RAPHAEL
J.